DETROIT FIRE FIGHTERS ASSOCIATION v CITY OF DETROIT

Docket No. 60473. Argued February 1, 1979 (Calendar No. 3).—Decided June 24, 1980.

Detroit Fire Fighters Association, Local 344, International Association of Fire Fighters, charged the City of Detroit with committing unfair labor practices under the public employment relations act by a unilateral "reorganization" of the city fire department, demotions of 150 fire officers, and refusal to supply certain requested information on the effect of the reorganization. The Employment Relations Commission, on the defendant city's motion, deferred hearing the charges until after an arbitration proceeding under the parties' collective bargaining agreement, subject to future review by the Employment Relations Commission. The Court of Appeals, Danhof, C.J., and Beasley, J. (M. F. Cavanagh, J., dissenting), affirmed (Docket No. 77-1460). The plaintiff appeals. In an opinion by Justice Ryan, joined by Chief Justice Coleman and Justices Fitzgerald and Moody, the Supreme Court held:

1. The question asked in this case must be decided within the

REFERENCES FOR POINTS IN HEADNOTES

[1] 48A Am Jur 2d, Labor and Labor Relations §§ 1764-1775.

[2] 48A Am Jur 2d, Labor and Labor Relations §§ 1770, 1773.
Validity and construction of statutes or ordinances providing for arbitration of labor disputes involving public employees. 68 ALR3d 885.

[3, 5] 48A Am Jur 2d, Labor and Labor Relations §§ 1769, 1773.
Validity and construction of statutes or ordinances providing for arbitration of labor disputes involving public employees. 68 ALR3d 885.

[4, 6, 17] 48A Am Jur 2d, Labor and Labor Relations § 1770

[7, 14, 15, 19-24] 48 Am Jur 2d, Labor and Labor Relations § 620 et seq.
48A Am Jur 2d, Labor and Labor Relations § 1764.

[8-10] 48 Am Jur 2d, Labor and Labor Relations § 620 et seq.

[11, 12] 48 Am Jur 2d, Labor and Labor Relations § 626.

[13] 48 Am Jur 2d, Labor and Labor Relations § 621.

[16, 24] 48A Am Jur 2d, Labor and Labor Relations § 1769.

[18] 2 Am Jur 2d, Administrative Law §§ 191, 192.

[23, 24] 5 Am Jur 2d, Arbitration and Award § 145.

boundaries of, and with reference to, the record from which the issue arises. The record discloses that the Employment Relations Commission has very plainly declared that it will apply Federal "post-award" review in this case, in accordance with its established policy of applying a combined "pre-arbitral" and "post-award" Federal doctrine in all such deferral cases. The Court must decide then, on the record presented, whether the order of the commission implementing its established policy, "pre-arbitral" deferral to arbitration subject to "post-award" review, comports with the specific and clearly expressed procedural requirements of the public employment relations act.

2. While the public employment relations act (PERA) is patterned after the National Labor Relations Act (NLRA) in several respects, it contains some important provisions which are without parallel in the Federal act. For example, PERA prohibits strikes by public employees, directs that "any proceeding" relating to charges of unfair labor practices be conducted pursuant to the Administrative Procedures Act, and requires that the Employment Relations Commission in resolving unfair practices complaints make findings of fact which are reviewable as a matter of right in the Court of Appeals under the competent, material, and substantial evidence standard. The Court is asked to find a legislative intent to permit virtually complete delegation of statutory unfair labor practice issues to a private arbitrator acting in an informal setting without a record.

3. The record establishes that the Employment Relations Commission would, absent the Court's disapproval, employ its version of the Federal deferral doctrine in this case. As long as the arbitrator resolves the charge of an unfair labor practice in a manner "not repugnant" to PERA, the Employment Relations Commission would do no more than adopt the arbitrator's resolution of the charges as its "decision". There would be no compliance with the Administrative Procedures Act or the statutory standards for reviewing a decision made by the Employment Relations Commission. The supposed celerity of the deferral doctrine is subject to doubt, as indicated by this case, because the decision to defer requires analysis and determination of the applicability of the Federal deferral doctrine; that decision itself is appealable and in this case is under review over three years after its entry. Moreover, Justice Williams finds that it was improper to defer to arbitration the charge of refusal to furnish relevant information, which requires that part of the complaint be remanded to the Employment Relations Commission under PERA and that part be

remanded to arbitration under the deferral doctrine. In the light of the provisions of PERA which are without parallel in the Federal act, it cannot be declared that there was a legislative intent to authorize such a discretionary deferral to arbitration and the multiple proceedings in this case with their obvious delay and inconvenience.

4. The Federal concerns which prompted the adoption of the deferral doctrine are conspicuously absent in Michigan public employment relations. The Federal deferral doctrine is the result of the National Labor Relations Board's effort to resolve two potentially conflicting expressions of congressional policy concerning private sector labor disputes, one being that the NLRA should have exclusive jurisdiction to prevent unfair labor practices in the private sector and the other a policy which favors the fullest use of collective bargaining and the arbitral process to promote voluntary resolution of private sector labor disputes. It is not an attempt by the National Labor Relations Board to substitute its judgment for that of Congress on how such disputes should be resolved. No comparable statutory conflict has been imposed upon the Employment Relations Commission or the Court by the Legislature.

5. The Legislature in the labor mediation act has manifested a preference in the private sector for the voluntary resolution of contractual labor disputes through private arbitration. In contrast, the PERA does not express a purpose of providing for arbitration. When the Legislature has intended to provide for arbitration of public employees' collective bargaining disputes, it has spoken plainly. Moreover, it has provided for a quite different procedural framework for such arbitration than would be in effect under a Federal deferral doctrine applied to PERA. For example, under the act providing for compulsory arbitration of labor disputes in police and fire departments, arbitrators are chosen from a panel of qualified persons maintained by the Employment Relations Commission; the act authorizes informal proceedings but mandates the making of a verbatim record; and the decision of the arbitrators is subject to review under the competent, material, and substantial evidence standard. Furthermore, the police and fire department act is concerned with "interest" arbitration, the formation of contracts, involving primarily economic issues, while PERA is concerned with statutory rights. The Legislature could not have intended that greater deference to arbitration be permitted for charges of unfair labor practices under PERA than is permitted by the express provision for compulsory arbitration of economic inter-

ests in contract formation by police and fire department employees.

6. Collective bargaining in the public sector is obviously greatly affected by political pressures and concerns, as well as by economic factors. The services performed by public employees, such as the fire fighters in this case, tend to be essential to the public health, safety, and welfare, and the Legislature was cognizant of these considerations when it enacted PERA, as is evidenced by the prohibition of strikes by public employees. However, it is clear that the Legislature intended to provide public employees with nearly the same collective bargaining rights as those possessed by private sector employees, to the extent that public policy can allow. The Legislature has, through PERA, assured public employees of protection against unfair labor practices, and of remedial access to a state administrative agency with special expertise in statutory unfair labor practice matters. Additional safeguards, that the Employment Relations Commission must comply with the Administrative Procedures Act and make findings in support of its decisions which are reviewable under the competent, material, and substantial evidence standard, have been provided. These procedures are designed to promote and maintain the confidence and high morale of public employees, who, being prohibited from striking, must rely heavily on the statutory protection afforded them. The alternative of deferral under the Federal doctrine to arbitration of unfair labor practice charges by public employees is, under any circumstances, antithetical to these legislatively provided means for resolution of such charges under PERA. There is no legislative intent to forbid or discourage voluntary arbitration of public employees' grievance disputes. Rather, PERA and related statutes manifest a clear legislative intent that, once a party to a public employment collective bargaining relationship invokes jurisdiction of the Employment Relations Commission under PERA, the complaint be resolved by the Employment Relations Commission in accordance with the statutory processes.

Justice Williams wrote to affirm in part:

1. The propriety of pre-arbitral deferral of grievance disputes is a question of first impression in this state. However, the underlying labor legislation in question, the public employment relations act (PERA), is derived from and modeled on the National Labor Relations Act (NLRA). Moreover, the language of the pivotal PERA section is nearly identical with that of the pertinent section of the NLRA. The Court may appropriately look to Federal precedents for guidance in construing the

PERA, and in this case found that there is a large body of Federal administrative and judicial authority addressing the issue. Furthermore, the Employment Relations Commission has largely followed that Federal precedent in this case. Those Federal precedents considering and upholding pre-arbitral deferral are both applicable and persuasive.

2. The fundamental legislative and policy considerations which influenced those Federal rulings apply with even more vitality to the pertinent Michigan statutes and support the Court's ruling here. Deferring the exercise of the Employment Relations Commission's jurisdiction until after a grievance arbitration award comports with the state's preference for the voluntary resolution of contractual labor disputes through mutually binding procedures established by collective bargaining. The Legislature has manifested this preference through its enactment of the labor mediation act and of PERA. The preference is especially compelling in the case of public employees, including fire fighters, who are denied the right to strike and statutorily limited to other methods of resolving grievance disputes through collective bargaining.

3. The Employment Relations Commission has adopted and elaborated on guidelines approved by the Federal rulings in determining which cases to defer. It certainly has not evidenced an arbitrary policy of refusing to consider exercising, without regard to the circumstances, power conferred upon it by the PERA. The commission has not abdicated its discretionary authority under the statute, but has merely abstained from deciding a dispute not primarily statutory in nature and arguably covered by the parties' collective bargaining agreement, until the parties have exhausted their contractual remedies. Furthermore, the commission in this case has retained jurisdiction to determine whether the arbitrator's award comports with the guidelines of the caselaw.

4. The Employment Relations Commission *may* when presented with allegations of unfair labor practices defer hearing of the charges until after an arbitration award has been rendered pursuant to the parties' binding collective bargaining agreement, subject to proper post-award review, where (1) a stable bargaining relationship and the absence of enmity is found to exist between the parties; (2) there is found to exist an intent on the respondent's part to exhaust the parties' contract grievance procedures culminating in final and binding arbitration; and (3) the subject matter of the alleged unfair labor practice is determined to be arguably covered by the parties' collective bargaining agreement, centering on the interpreta-

tion or application of the contract, and is not primarily statutory in nature.

5. In this case, the Employment Relations Commission found that the previous failures of the defendant city in its bargaining with the fire fighters' union do not sustain a finding that the city has shown such hostility and animosity toward collective bargaining and the contractual grievance settlement process as to justify a refusal to defer to arbitration, and that a litigious history between the parties does not necessarily render deferral of jurisdiction inappropriate. The factual determination by the Employment Relations Commission, on review of the record as a whole, is supported by competent, material, and substantial evidence; and it is not erroneous as a matter of law. The city has shown a manifest willingness to arbitrate the plaintiff's dispute under the terms of the parties' collective bargaining agreement. The issues of demotion, transfer, and tactical mobile squad and battalion reductions are arguably covered by the parties' arbitration agreement. However, the parties' agreement is silent as to the defendant's duty to provide the plaintiff relevant information. Therefore, the order of the Employment Relations Commission is affirmed, except as to the failure to provide relevant information, which is remanded to the Employment Relations Commission for a hearing.

Justice Levin, joined by Justice Kavanagh, agreed with Justice Williams that pre-arbitral deferral is statutorily permissible. However, they wrote that since the deferral question is not presented in a factual context, and there is only presented the abstract question whether in some circumstances the MERC may defer, they should not attempt to announce the circumstances in which deferral is appropriate and expressed no opinion in that regard.

The order of the Employment Relations Commission is reversed, and the matter is remanded to the Employment Relations Commission for plenary consideration of the plaintiff's complaint.

OPINION OF THE COURT

1. LABOR RELATIONS — PUBLIC EMPLOYMENT — UNFAIR LABOR PRACTICES — NATIONAL LABOR RELATIONS ACT — CONSTRUCTION OF STATUTES.

The public employment relations act is patterned after the National Labor Relations Act but it contains some important provisions which are without parallel in the Federal act and

which may limit the adoption of Federal doctrines in constru-
ing the public employment relations act; *e.g.*, it prohibits
strikes by public employees, directs that "any proceeding"
relating to charges of unfair labor practices be conducted under
the Administrative Procedures Act, and requires that the Em-
ployment Relations Commission make findings of fact in resolv-
ing the charges which are reviewable as a matter of right
under the competent, material, and substantial evidence stan-
dard (29 USC 151 *et seq.;* MCL 24.271 *et seq.,* 423.201 *et seq.;*
MSA 3.560[171] *et seq.,* 17.455[1] *et seq.).*

2. LABOR RELATIONS — PUBLIC EMPLOYMENT — COLLECTIVE BARGAIN-
ING — DEFERRAL TO ARBITRATION.

The Legislature has manifested a preference in the case of
private employees for the voluntary resolution of contractual
labor disputes through private arbitration; when the Legisla-
ture has intended that there be arbitration of collective bar-
gaining disputes in the case of public employees, *e.g.*, concern-
ing contract formation in police and fire departments, it has
spoken plainly and has provided a procedural framework for
the arbitration (MCL 423.1 *et seq.,* 423.231 *et seq.;* MSA
17.454[1] *et seq.,* 17.455[31] *et seq.).*

3. LABOR RELATIONS — PUBLIC EMPLOYMENT — UNFAIR LABOR PRAC-
TICES — DEFERRAL TO ARBITRATION.

The Legislature could not have intended that greater deference to
arbitration be permitted with respect to charges of unfair labor
practices, involving statutory rights, under the public employ-
ment relations act than is permitted in disputes concerning
contract formation in police and fire departments, where the
statute provides for compulsory arbitration of economic inter-
ests with many procedural safeguards (MCL 423.201 *et seq.,*
423.231 *et seq.;* MSA 17.455[1] *et seq.,* 17.455[31] *et seq.).*

4. LABOR RELATIONS — PUBLIC EMPLOYMENT — COLLECTIVE BARGAIN-
ING — PUBLIC POLICY.

The Legislature intended to provide public employees with nearly
the same collective bargaining rights that private employees
possess, to the extent that public policy will allow; the statu-
tory procedures of the public employment relations act are
designed to promote and maintain the confidence and high
morale of public employees, who, being prohibited from strik-
ing, must rely heavily on the statutory protection afforded to
them (MCL 423.201 *et seq.,* 423.231 *et seq.;* MSA 17.455[1] *et
seq.,* 17.455[31] *et seq.).*

5. LABOR RELATIONS — PUBLIC EMPLOYMENT — UNFAIR LABOR PRAC-
   TICES — DEFERRAL TO ARBITRATION.

   Deferral by the Employment Relations Commission to arbitration
   of charges by public employees of unfair labor practices, under
   the doctrine of the National Labor Relations Board, would be
   antithetical to the means provided by the Legislature for
   resolution of such charges under the public employment rela-
   tions act (MCL 423.201 et seq.; MSA 17.455[1] et seq.).

6. LABOR RELATIONS — PUBLIC EMPLOYMENT — UNFAIR LABOR PRAC-
   TICES — DEFERRAL TO ARBITRATION.

   There is no legislative intent to forbid or discourage voluntary
   private arbitration of public employees' grievance disputes;
   rather the public employment relations act and related stat-
   utes manifest a clear legislative intent that, once a party to a
   public employment collective bargaining relationship invokes
   the jurisdiction of the Employment Relations Commission un-
   der the public employment relations act, the complaint should
   be resolved by the Employment Relations Commission in accor-
   dance with the statutory processes (MCL 423.201 et seq.; MSA
   17.455[1] et seq.).

OPINION BY WILLIAMS, J.

7. LABOR RELATIONS — PUBLIC EMPLOYMENT — UNFAIR LABOR PRAC-
   TICES — DEFERRAL TO ARBITRATION — CONSTRUCTION OF STAT-
   UTES.

   Michigan courts may appropriately look to the Federal prece-
   dents for guidance in considering the propriety of deferral by
   the Employment Relations Commission of a hearing on charges
   of unfair labor practices under the public employment relations
   act until after an arbitration award has been made in the same
   matter pursuant to the parties' collective bargaining agreement
   because the pertinent section of the public employment rela-
   tions act is virtually identical in language to the section of the
   National Labor Relations Act from which the Federal doctrine
   of pre-arbitration deferral arises (29 USC 160, subds (b), (c), and
   (e); MCL 423.216; MSA 17.455[16]).

8. LABOR RELATIONS — NATIONAL LABOR RELATIONS ACT — UNFAIR
   LABOR PRACTICES — DEFERRAL TO ARBITRATION.

   Federal cases under the National Labor Relations Act have
   upheld the doctrine of deferral of an administrative hearing on
   charges of unfair labor practices until after an arbitration
   award has been made pursuant to the parties' collective bar-

gaining agreement, provided the National Labor Relations
Board retains statutory jurisdiction to review the arbitration
award (29 USC 160).

9. LABOR RELATIONS — NATIONAL LABOR RELATIONS ACT — UNFAIR
     LABOR PRACTICES — PUBLIC POLICY.

  *The Supreme Court of the United States has stated in dictum
  that the policy of the National Labor Relations Board to
  refrain from exercising jurisdiction over disputed conduct
  which is arguably both an unfair labor practice and a contract
  violation where the parties have established, by contract, bind-
  ing arbitration procedures is a policy consistent with the funda-
  mental objectives of Federal law to require the parties to honor
  their contractual obligations rather than, by casting their
  dispute in statutory terms, to ignore their agreed-upon proce-
  dures; the deferral policy of the National Labor Relations
  Board harmonizes with the policy articulated by Congress that
  final adjustment by a method agreed upon by the parties is the
  desirable method for settlement of grievance disputes arising
  under an existing collective bargaining agreement (29 USC 160,
  29 USC 173[d]).*

10. LABOR RELATIONS — NATIONAL LABOR RELATIONS ACT — UNFAIR
     LABOR PRACTICES — DEFERRAL TO ARBITRATION.

  *The National Labor Relations Board has announced that, al-
  though it is not legally bound by an arbitration award made
  under the terms of a collective bargaining agreement, it would
  not upset the award where the proceedings appear to have been
  fair and regular, all parties had agreed to be bound, and the
  decision of the arbitrator is not clearly repugnant to the
  purposes and policies of the National Labor Relations Act,
  because, under the circumstances, the desirable objective of
  encouraging the voluntary settlement of labor disputes will
  best be served by recognition of the arbitrator's award (29 USC
  160).*

11. LABOR RELATIONS — NATIONAL LABOR RELATIONS ACT — UNFAIR
     LABOR PRACTICES — DEFERRAL TO ARBITRATION — DISCRETION.

  *The National Labor Relations Board has considerable discretion
  to respect an arbitration award made under the parties' collect-
  ive bargaining agreement and decline to exercise its authority
  over alleged unfair labor practices in the matter where to do so
  will serve the fundamental aims of the National Labor Rela-
  tions Act (29 USC 160).*

12. LABOR RELATIONS — NATIONAL LABOR RELATIONS ACT — UNFAIR
    LABOR PRACTICES — DEFERRAL TO ARBITRATION.

    *Federal caselaw generally indicates that the National Labor
    Relations Board will defer hearing a charge of an unfair labor
    practice to binding arbitration procedures under the parties'
    collective bargaining agreement, subject to administrative re-
    view of the arbitration award, where a stable collective bar-
    gaining relationship exists between the parties, the respondent
    is willing to resort to arbitration under a contractual clause
    broad enough to embrace the dispute, and the contract and its
    meaning are at the center of the dispute (29 USC 160).*

13. LABOR RELATIONS — PUBLIC EMPLOYMENT — UNFAIR LABOR PRAC-
    TICES — DEFERRAL TO ARBITRATION — PUBLIC POLICY.

    *The Employment Relations Commission, under the statutory
    policy of promoting the prevention and prompt settlement of
    labor disputes and other forms of industrial strife, has the
    authority to decline to accept jurisdiction in a proceeding and
    to defer to arbitration, subject to proper post-award review,
    under the terms of the parties' collective bargaining agreement
    as a means which the parties themselves have agreed to for the
    prompt and efficient resolution of disputes arising over contract
    terms (MCL 423.1; MSA 17.454[1]).*

14. LABOR RELATIONS — PUBLIC EMPLOYMENT — NATIONAL LABOR
    RELATIONS ACT — UNFAIR LABOR PRACTICES — CONSTRUCTION
    OF STATUTES.

    *One may assume that the language of the public employment
    relations act was intentionally adopted in anticipation of reli-
    ance by Michigan courts, as well as the Employment Relations
    Commission, on Federal precedent under the National Labor
    Relations Act in construing the statutory power of the Employ-
    ment Relations Commission over charges of unfair labor prac-
    tices because of the virtual identity in language of the public
    employment relations act and the National Labor Relations Act
    concerning administrative jurisdiction over charges of unfair
    labor practices (29 USC 160; MCL 423.216; MSA 17.455[16]).*

15. LABOR RELATIONS — PUBLIC EMPLOYMENT — UNFAIR LABOR PRAC-
    TICES — DEFERRAL TO ARBITRATION.

    *Subject to proper review of the arbitration award, the Employ-
    ment Relations Commission may exercise its discretion to defer
    hearing charges of unfair labor practices under the public
    employment relations act until after an arbitration award
    under the parties' collective bargaining agreement; the deferral
    of the administrative hearing comports with the policy of*

*preferring the voluntary resolution of contractual labor disputes through procedures under the parties' collective bargaining agreement (MCL 423.1, 423.216; MSA 17.454[1], 17.455[16]).*

16. LABOR RELATIONS — PUBLIC EMPLOYMENT — UNFAIR LABOR PRACTICES — ADMINISTRATIVE LAW — DISCRETION.

*The Legislature sought to couch the jurisdiction of the Employment Relations Commission over charges of unfair labor practices in discretionary terms by using the term "remediable" violations of the act rather than the directory language of the National Labor Relations Act that the power of the National Labor Relations Board over unfair labor practices "shall not be affected" by other means of adjustment provided by the parties' agreement (29 USC 160[a]; MCL 423.216; MSA 17.455[16]).*

17. LABOR RELATIONS — PUBLIC EMPLOYMENT — COLLECTIVE BARGAINING.

*The Legislature has stated, by the express language of the scheme of labor laws, a preference for the voluntary resolution of labor disputes which is especially compelling in the case of public employees, who are denied the right to strike and limited by statute to other methods of resolving disputes, including collective bargaining (MCL 423.1, 423.213, 423.231; MSA 17.454[1], 17.455[13], 17.455[31]).*

18. LABOR RELATIONS — PUBLIC EMPLOYMENT — UNFAIR LABOR PRACTICES — ADMINISTRATIVE LAW — DISCRETION.

*The Employment Relations Commission may not properly adopt an arbitrary policy of refusing to consider exercising, without regard to the circumstances, power conferred upon it by the public employment relations act, because an administrative agency empowered to exercise discretion abuses its discretion and errs as a matter of law when it absolutely refuses in every and any instance to exercise its discretion (MCL 423.216; MSA 17.455[16]).*

19. LABOR RELATIONS — PUBLIC EMPLOYMENT — UNFAIR LABOR PRACTICES — DEFERRAL TO ARBITRATION — DISCRETION.

*The Employment Relations Commission, by exercising pre-arbitration deferral, does not abdicate its discretion under the public employment relations act, but merely properly abstains from deciding a labor dispute not primarily statutory in nature and arguably covered by the parties' collective bargaining agreement until the parties have exhausted their contractual remedies, where the commission has not only inquired into the merits of the contractual nature of the grievance at issue, the*

bargaining history of the parties, and the employer's willingness to arbitrate the grievance, but has additionally retained jurisdiction to determine whether the arbitration award comports with the requirements of proper post-award review (MCL 423.216; MSA 17.455[16]).

20. LABOR RELATIONS — PUBLIC EMPLOYMENT — UNFAIR LABOR PRACTICES — DEFERRAL TO ARBITRATION.

The Employment Relations Commission may appropriately defer hearing charges of unfair labor practices under the public employment relations act until after an arbitration award has been made under the collective bargaining agreement, subject to proper post-award review, where 1) a stable bargaining relationship and an absence of enmity is found to exist between the parties, 2) an intent is found on the respondent's part to exhaust the parties' contractual procedure for resolving disputes, culminating in final and binding arbitration, and 3) the subject matter of the alleged unfair labor practice is arguably covered by the parties' collective bargaining agreement, centering on the interpretation or application of the contract, and is not primarily statutory in nature.

21. LABOR RELATIONS — PUBLIC EMPLOYMENT — UNFAIR LABOR PRACTICES — DEFERRAL TO ARBITRATION — ANTI-UNION ANIMOSITY.

Previous failure of the City of Detroit in its collective bargaining with a fire fighters' union, or a litigious history between the parties, does not necessarily evidence an "anti-union history" which would sustain a finding by the Employment Relations Commission that the city has a background of such hostility and animosity toward collective bargaining and grievance settlement under the parties' contract as to justify a refusal by the commission to defer hearing charges of unfair labor practices under the public employment relations act until after an arbitration award is made in the same matter under the parties' contract (MCL 423.216; MSA 17.455[16]).

22. LABOR RELATIONS — PUBLIC EMPLOYMENT — UNFAIR LABOR PRACTICES — DEFERRAL TO ARBITRATION.

The Employment Relations Commission may not refuse to hear a charge of an unfair labor practice by a fire fighters' union against the City of Detroit in failing to provide certain information on the effects of a reorganization of the city fire department where the parties' collective bargaining agreement is silent on the duty to provide such information (MCL 423.216; MSA 17.455[16]).

23. LABOR RELATIONS — PUBLIC EMPLOYMENT — UNFAIR LABOR PRAC-
    TICES — DEFERRAL TO ARBITRATION — REVIEW OF AWARD.

*No opinion is offered on the constitutional or statutory efficacy of
post-arbitration deferral by the Employment Relations Commis-
sion to an award by arbitration pursuant to a collective bar-
gaining agreement after the award is made in a case in which
the issue framed on grant of leave to appeal was limited to pre-
arbitration deferral; the Supreme Court will not anticipate
potential issues and offer advisory opinions respecting issues
not ripe for review.*

OPINION BY LEVIN, J.

24. LABOR RELATIONS — PUBLIC EMPLOYMENT — UNFAIR LABOR PRAC-
    TICES — DEFERRAL TO ARBITRATION — APPEAL.

*The Supreme Court should not announce the circumstances in
which the Employment Relations Commission may decline to
hear charges of unfair labor practices under the public employ-
ment relations act and defer to arbitration under the collective
bargaining agreement where the deferral question is not pre-
sented in a factual context, and there is only presented the
abstract question whether in some circumstances the Employ-
ment Relations Commission may defer (MCL 423.216; MSA
17.455[16]).*

*Marston, Sachs, Nunn, Kates, Kadushin &
O'Hare, P.C.,* for plaintiff.

*Roger E. Craig,* Corporation Counsel, *George G.
Matish,* Deputy Corporation Counsel, and *Anna
Diggs-Taylor* and *Frank W. Jackson,* Assistants
Corporation Counsel, for defendant.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, and *Jon M. DeHorn,*
Assistant Attorney General, for Employment Rela-
tions Commission.

RYAN, J. We granted leave in this case limited
to one issue:

"Whether the Michigan Employment Relations Com-
mission may, when presented with allegations of unfair

labor practices, defer hearing of those charges until after an arbitration award has been made pursuant to the collective bargaining agreement, where the subject matter of the alleged unfair labor practices is arguably covered by the collective bargaining agreement in question."[1]

At the heart of this issue is whether our state Legislature, in enacting the public employment relations act[2] (PERA), intended to authorize the Michigan Employment Relations Commission[3] (MERC) to defer in its resolution of statutory unfair labor practice[4] charges to the contract law determinations of a private arbitrator reached in an informal and recordless setting.

A review of the statutory scheme for adjudication of unfair labor practice charges in the public sector, and related statutes, leads us to the conclusion that the Legislature did not intend such significant deferral to private arbitration of public sector statutory grievance disputes as would occur pursuant to MERC's decision and order in this case.

Accordingly, we hold that MERC's order deferring its processes in this case pending the outcome of private arbitration should be reversed, and remand this matter to MERC for plenary consideration of the plaintiff's complaint pursuant to the statutorily provided means.

I

We agree generally with the exposition of the

[1] 402 Mich 917 (1978).

[2] 1947 PA 336, as amended by 1965 PA 379; MCL 423.201 *et seq.;* MSA 17.455(1) *et seq.*

[3] See MCL 423.3; MSA 17.454(3).

[4] See MCL 423.210; MSA 17.455(10).

facts that is contained in Part I of Justice WIL-
LIAMS' opinion. However, we find it necessary to
focus greater attention upon the administrative
decisions and orders which compose the record in
this case. The question that we are asked in this
case must, of course, be decided within the bounda-
ries of, and with reference to, the concrete record
from which the issue arises.[5]

Justice WILLIAMS perceives the issue to be:
"[T]he question remains whether MERC, like the
NLRB pursuant to NLRA, § 10, may exercise dis-
cretionary deferral authority pursuant to the *pro-
cedural* outline of PERA, § 16 subject to *proper*
post-award review. We answer this inquiry in the
affirmative." WILLIAMS, J., p 716 (emphasis on
"proper" added).

A review of the decisions and orders below
discloses that MERC has very plainly declared
that it will apply *Spielberg* post-award review in
this case,[6] in accordance with its established policy

---

[5] MERC's order in this case clearly provides for *Spielberg* post-
award review of the arbitrator's decision, rather than some inarticu-
lated "proper" review. *Spielberg Mfg Co,* 112 NLRB 1080; 36 LRRM
1152 (1955). This case accordingly concretely presents the question of
the propriety of the *Collyer-Spielberg* doctrine. *Collyer Insulated
Wire,* 192 NLRB 837; 77 LRRM 1931 (1971).

[6] Indeed, in Part II of MERC's decision in this case, under the
heading of "Clarification of Commission Deferral Policy", it is stated:

"Procedurally, the deferral policy signifies that the Commission
conditionally dismisses charges without prejudice to either party and
without deciding the merits of the dispute but retains its jurisdiction
to insure that the prospective arbitration award complies with the
principles set forth in *Spielberg* and *City of Flint* [1970 MERC Lab Op
367]. This policy explicitly preserves the right of either party to
secure further Commission review of the matter upon a showing that
the award has not satisfied the *Spielberg* standards."

In addition, in MERC's brief to this Court, it is argued:

"When MERC decides that deferral to arbitration is appropriate, its
procedure is to dismiss the charges conditionally without prejudice to
either party and without deciding the merits of the dispute. MERC
retains jurisdiction to ensure that the prospective arbitration award
complies with the standards set forth by the NLRB in *Spielberg Mfg
Co,* 112 NLRB 1080; 36 LRRM 1152 (1955), which standards were

of applying a combined *Collyer-Spielberg* doctrine in all such deferral cases. *Collyer Insulated Wire,* 192 NLRB 837; 77 LRRM 1931 (1971); *Spielberg Mfg Co,* 112 NLRB 1080; 36 LRRM 1152 (1955).

We must decide then, on the record presented, whether MERC's order implementing its established policy of *Collyer* deferral subject to *Spielberg* post-award review comports with the specific and clearly expressed procedural requirements of PERA as discussed hereinafter.

## II

While in several respects PERA is "patterned after" the National Labor Relations Act[7] (NLRA), it nevertheless contains some important provisions which are without parallel in the Federal act. Among the significant differences are these:

(1) PERA's prohibition of strikes by public employees, MCL 423.202; MSA 17.455(2);

(2) PERA's directive that "[a]ny proceeding" relating to statutory unfair labor practice charges "shall be conducted pursuant to chapter 4 of [the Michigan Administrative Procedures Act]", MCL 423.216(a); MSA 17.455(16)(a); and

---

embraced by MERC in *City of Flint,* 1970 MERC Lab Op 367. [7] In keeping with this policy, the right of either party to secure further commission review of the matter, upon a showing that the award has not satisfied the *Spielberg* standards, is explicitly preserved."

"[7] In accordance with these standards, neither MERC nor the NLRB will adjudicate the merits of a dispute previously arbitrated where: (1) the arbitration proceedings were fair and legal; (2) all parties had agreed that the arbitration proceedings were final and binding; and (3) the arbitration award was not clearly repugnant to the purpose and policies of the act. MERC also requires that the unfair labor practice issues giving rise to the charge be considered and decided by the arbitrator. (See 21a, fn 2.)" Brief of Appellee Michigan Employment Relations Commission, p 6.

[7] 29 USC 151 *et seq.*

(3) PERA's requirement that MERC make findings of fact in resolving unfair practices complaints, and that MERC's decisions be reviewable as a matter of right in the Court of Appeals under the competent, material, and substantial evidence standard,[8] MCL 423.216(d), 423.216(e); MSA 17.455(16)(d), 17.455(16)(e).

Against the background of these specific and deliberate provisions, we are asked to find a legislative intent to permit virtually *complete delegation* of statutory unfair labor practice issues to a private arbitrator acting in an informal and recordless setting. The foregoing emphasis on "complete delegation" derives indisputably from a review of the instant record which establishes that MERC would, absent our disapproval, employ its version of *Collyer-Spielberg* deferral in this case.[9]

Under MERC's version of *Collyer-Spielberg,* as long as the arbitrator's contract-law decision indicates resolution of the statutory unfair labor practice charge in a manner "not repugnant" to PERA, MERC would do no more than adopt the arbitrator's conjectured resolution of the statutory charges as its "decision". There would be no compliance, by the arbitrator or MERC, with the Administrative Procedures Act, no record for appellate purposes would be available, and MERC's "decision" would seemingly never be based on competent, substantial, and material evidence, all contrary to PERA.

Further, if this case is any indication, the supposed celerity of *Collyer-Spielberg* deferral is sub-

---

[8] See Const 1963, art 6, § 28; see also MCL 24.306; MSA 3.560(206).

[9] The NLRB's combined *Collyer-Spielberg* deferral doctrine, which has been admittedly adopted by MERC, and applied by MERC's order in this case, and implicitly approved by Justice WILLIAMS' partial affirmance of that order, is accurately summarized in Justice WILLIAMS' opinion, p 710.

ject to doubt.[10] MERC's decision and order for
*Collyer-Spielberg* deferral in this case was entered
on April 4, 1977. The decision to defer requires
analysis and determination of the applicability of
the *Collyer* criteria. Such a decision is itself ap-
pealable and, in this instance, is here under re-
view over three years after entry.

Moreover, in this case, Justice WILLIAMS finds
that even under the *Collyer-Spielberg* doctrine,
MERC has improperly attempted to defer to pri-
vate arbitration of the association's refusal to
furnish relevant information charge. The commis-
sion's error in this regard requires, under Justice
WILLIAMS' analysis, a bifurcation of the associa-
tion's unfair labor practice complaint, with part
being remanded to MERC for resolution according
to PERA, and part to private arbitration under the
*Collyer-Spielberg* policy.

Thus, in the present case, we are asked to
attribute to the Legislature an intent, in enacting
PERA, not only to authorize MERC to discretion-
ally defer to private arbitration of public sector
statutory unfair labor practice charges under a
*Collyer-Spielberg* doctrine, but also an intent to
approve bifurcated proceedings attended with obvi-
ous delay and inconvenience. We are unable, in
light of the specific and deliberate provisions of
PERA discussed above, to declare the existence of
such a legislative intent. Moreover, for reasons to
be developed hereinafter, we find that the concerns
which prompted the NLRB to narrowly adopt the
*Collyer* doctrine in the Federal sphere are conspic-

---

[10] Certainly, reasonable concerns can be stated over the delay that
might be attendant to the thorough processes provided under PERA.
However, it would appear that the Legislature has addressed such
concerns by expressly authorizing any charging party, or MERC, to
petition the circuit court for temporary relief or a restraining order
upon the issuance of a complaint by MERC. MCL 423.216(h); MSA
17.455(16)(h).

uously absent in our state's public employee labor relations sphere.

### III

### A

The *Collyer* deferral doctrine, which is thoroughly discussed in our brother's opinion, had its origin in the National Labor Relations Board's (NLRB) resolution of a dilemma presented by two expressed, and potentially conflicting, congressional policies. The first of these statutory policies is that of the NLRA's, that the NLRB should have exclusive jurisdiction to prevent unfair labor practices (in the *private* sector). The second statutory policy is that of the Labor Management Relations Act[11] (LMRA), which favors the fullest use of collective bargaining and the arbitral process (to promote voluntary resolution of *private* sector labor disputes). The deferral policy adopted in *Collyer* is the result, then, of the NLRB's effort to resolve the dilemma presented by opposing expressions of congressional intent. Certainly, the NLRB's *Collyer* decision was not an attempt by the NLRB to substitute its judgment respecting how labor disputes should be resolved in place of Congress' judgment, as the latter is stated in the NLRA and LMRA. See *Collyer Insulated Wire, supra.* An analysis of PERA and related Michigan labor relations statutes reveals to us that no comparable dilemma has been imposed upon MERC or this Court by our Legislature.

### B

We agree with Justice WILLIAMS that our Legis-

---

[11] 29 USC 141 *et seq.*

lature "has manifested [a] preference in the *private sector*" for the voluntary resolution of contractual labor disputes through private arbitration. (Emphasis supplied.) Indeed, the title to the labor mediation act[12] includes in its enumeration of purposes the following: "to provide for the mediation *and arbitration* of labor disputes". 1939 PA 176 (emphasis supplied).

In contrast, the title to PERA contains no reference to a purpose of providing for arbitration under that act:

"AN ACT to prohibit strikes by certain public employees; to provide review from disciplinary action with respect thereto; to provide for the mediation of grievances and the holding of elections; to declare and protect the rights and privileges of public employees; and to prescribe means of enforcement and penalties for the violation of the provisions of this act." 1947 PA 336, as amended.

When the Legislature has intended to provide for arbitration of public employee collective bargaining disputes, as in the case of the compulsory arbitration of labor disputes in police and fire departments act[13] (PA 312), it has spoken plainly:

"AN ACT to provide for compulsory arbitration of labor disputes in municipal police and fire departments; to define such public departments; to provide for the selection of members of arbitration panels; to prescribe the procedures and authority thereof; and to provide for the enforcement and review of awards thereof."

Moreover, as is evidenced by PA 312, when the Legislature has intended the use of arbitration in

---

[12] 1939 PA 176, as amended; MCL 423.1 *et seq.;* MSA 17.454(1) *et seq.*

[13] 1969 PA 312; MCL 423.231 *et seq.;* MSA 17.455(31) *et seq.*

the public sector, it has provided for a quite different framework for such arbitration than would be in effect under a MERC *Collyer-Spielberg* deferral doctrine under PERA. For example, under PA 312, arbitrators are chosen from a panel of qualified individuals maintained by MERC, under a procedure enabling some limited input from the parties. MCL 423.235; MSA 17.455(35). While the act authorizes informal proceedings, the making of a verbatim record is mandated.[14] MCL 423.236; MSA 17.455(36). In addition, the majority decision of the arbitration panel is subject to review under the competent, material, and substantial evidence standard.[15] MCL 423.240, 423.242; MSA 17.455(40), 17.455(42).[16]

When it is remembered that PA 312 concerns itself with "interest" arbitration *(i.e., contract formation)* involving primarily *economic* issues, as opposed to the *statutory rights* involved under PERA, the above-discussed provisions of PA 312 take on added significance.

The foregoing analysis of PA 312 establishes, to our satisfaction, that the Legislature could not have intended that *greater* deference to private arbitration methods be permitted with respect to PERA statutory unfair labor practice charges than is permitted under PA 312, where compulsory arbitration of primarily economic interests in contract formation is expressly provided for.

Collective bargaining in the public sector is

[14] See generally *Dation v Ford Motor Co,* 314 Mich 152; 22 NW2d 252 (1946); *Alpena v Alpena Fire Fighters Ass'n,* 56 Mich App 568, 572; 224 NW2d 672 (1974), lv den 394 Mich 761 (1975).

[15] See fn 8, *supra;* see generally *Michigan Employment Relations Comm v Detroit Symphony Orchestra, Inc,* 393 Mich 116; 223 NW2d 283 (1974).

[16] No opinion is here intimated as to the constitutional validity of these or any other provisions of 1969 PA 312, as amended by 1976 PA 84.

obviously greatly affected by political pressures and concerns, as well as economic factors. The services performed by public employees, such as the fire fighters in this case, tend to be essential to the public health, safety, and welfare. Certainly, the Legislature was cognizant of these considerations when it enacted PERA, as is evidenced by that act's prohibition of public employee strikes. At the same time, however, it is clear that the Legislature intended to provide public employees with nearly the same collective bargaining rights as are possessed by private sector employees, to the extent that public policy can allow. Toward that end, the Legislature has, through PERA, assured public employees of protection against unfair labor practices, and of remedial access to a state-level administrative agency with special expertise in statutory unfair labor practice matters. The additional safeguards that MERC must comply with the APA, and make findings in support of its decisions which are reviewable under the competent, material, and substantial evidence standard have been provided. These processes seem well designed to promote and maintain the confidence and high morale of public employees, who, being prohibited from striking, must rely heavily on the statutory protections afforded under PERA.[17] The alternative of *Collyer-Spielberg* defer-

---

[17] The right of private sector employees to strike has a significant role in private sector collective bargaining. The union is normally willing to give up that right in exchange for the employer's agreement to acceptable methods of grievance resolution. See, *e.g., Alexander v Gardner-Denver Co,* 415 US 36, 54-55; 94 S Ct 1011; 39 L Ed 2d 147 (1974):

"The primary incentive for an employer to enter into an arbitration agreement is the union's reciprocal promise not to strike. As the Court stated in *Boys Markets v Retail Clerks Union,* 398 US [235, 248; 90 S Ct 1583; 26 L Ed 2d 199 (1970)], 'a no-strike obligation, express or implied, is the *quid pro quo* for an undertaking by the employer to submit grievance disputes to the process of arbitration.' "

We would seem warranted, then, in concluding that PERA's impor-

ral to private arbitration of public employee unfair labor practice charges is, under any circumstances, antithetical to these legislatively provided means for resolution of such charges under PERA.

Finally, in our analysis, it is emphasized that we find no legislative intent forbidding or discouraging voluntary private arbitration of public employee grievance disputes. Rather, we read PERA and related state statutes as manifesting a clear legislative intent that, once a party to a public sector employment collective bargaining relationship invokes MERC's jurisdiction under PERA, that party's complaint should be resolved by MERC in accordance with the statutory processes.

## IV

In conclusion, we cannot agree that our Legislature intended the degree of delegation to private arbitration of public employment unfair labor practice matters that would be effected under the *Collyer-Spielberg* deferral doctrine. It appears instead that the Legislature deliberately provided for thorough MERC processes, and scrupulous review of MERC decisions, under PERA. We are not faced with the kind of conflicting expressions of legislative intent which led to the NLRB's adoption of the *Collyer* deferral doctrine. On the contrary, our Legislature has determined that our state's public policy is best served when public employment disputes, implicating statutory rights, are resolved under a system which provides significant procedural, and appellate review, protections. We do not substitute the public policy evaluations

---

tant procedural guarantees were intended to offset the bargaining detriment to public employees which results from PERA's prohibition of public employee strikes.

of this Court for the considered, and clearly expressed, policy judgments of the Legislature.

Accordingly, we reverse MERC's order in this case and remand this matter to MERC for plenary consideration of the plaintiff association's complaint pursuant to the statutorily provided processes.

COLEMAN, C.J., and FITZGERALD and BLAIR MOODY, JR., JJ., concurred with RYAN, J.

WILLIAMS, J. *(for affirmance in part and reversal in part).* The important question in this case is designated by this Court's grant of leave to appeal, limited to the following issue:

"Whether the Michigan Employment Relations Commission may, when presented with allegations of unfair labor practices, defer hearing of those charges until after an arbitration award has been made pursuant to the collective bargaining agreement, where the subject matter of the alleged unfair labor practices is arguably covered by the collective bargaining agreement in question."

In essence, this issue requires us to determine whether the doctrine of "pre-arbitral" deferral is statutorily permissible under Michigan law and, if so, under what conditions. As indicated in footnote 15, *infra,* we express no opinion concerning either the statutory or constitutional efficacy of *post*-arbitration award, or *Spielberg*-type, deferral.

This is a question of first impression in this state. However, the underlying Michigan labor legislation in question, the public employment relations act (hereinafter PERA),[1] is "modeled on

---

[1] MCL 423.201 *et seq.;* MSA 17.455(1) *et seq.*

the National Labor Relations Act (NLRA)",[2] and is derived from that Federal act.[3] Moreover, the language of the pivotal PERA section, § 16,[4] is nearly identical in language with the pertinent Federal statutory section of the NLRA, § 10.[5] In those instances where we have earlier been confronted with an issue relevant to PERA, this Court has indicated that it "may appropriately look to the Federal precedents for guidance".[6] We have done

[2] *Rockwell v Crestwood School Dist,* 393 Mich 616, 635-636; 227 NW2d 736 (1975), *app dis* 427 US 901; 96 S Ct 3184; 49 L Ed 2d 1195 (1976).

[3] *Lamphere Schools v Lamphere Federation of Teachers,* 400 Mich 104, 120; 252 NW2d 818 (1977).

[4] Section 16 of PERA, MCL 423.216; MSA 17.455(16), provides in pertinent part:

"Violations of the provisions of section 10 [defining statutory unfair labor practices] shall be deemed to be unfair labor practices *remediable* by the commission in the following manner:

"(a) Whenever [a statutory unfair labor practice] is charged * * * the commission * * * *may issue and cause to be served* upon the person a complaint stating the charges in that respect, * * *

"(b) * * * *If upon the preponderance of the testimony* taken the *commission is of the opinion that any person named in the complaint has engaged in or is engaging in the unfair labor practice, then it shall* state its findings of fact and shall issue and cause to be served on the person an order requiring him to cease and desist from the unfair labor practice * * *. *If upon the preponderance of the testimony taken the commission is not of the opinion that the person named in the complaint has engaged in or is engaging in the unfair labor practice, then the commission shall* state its findings of fact and shall issue an order dismissing the complaint." (Emphasis supplied.)

[5] 29 USC 160 is a lengthy statute but the critical language is reprinted below:

"(b) Whenever it is charged that any person has engaged in * * * any such unfair labor practice, the Board, * * * *shall have power to issue and cause to be served* upon such person a complaint stating the charges in that respect, * * *.

"(c) * * * *If upon the preponderance of the testimony taken the Board shall not be of the opinion that the person named in the complaint has engaged in * * * any such unfair labor practice, then the Board shall* state its findings of fact and shall issue an order dismissing the said complaint." (Emphasis supplied.)

[6] See *MERC v Reeths-Puffer School Dist,* 391 Mich 253, 260; 215 NW2d 672 (1974); *Detroit Police Officers Ass'n v Detroit,* 391 Mich 44, 53; 214 NW2d 803 (1974); *Rockwell,* fn 2 *supra; Lamphere Schools,* fn 3 *supra.*

so in this case and find that there exists a large body of Federal administrative and judicial authority addressing the issue before us. Furthermore, the Michigan Employment Relations Commission (hereinafter MERC) has largely followed that Federal precedent in the case at bar.

We find those Federal precedents considering and upholding pre-arbitral deferral to be both applicable and persuasive. We have reviewed the fundamental legislative and policy considerations which influenced those Federal rulings and find that such considerations apply with even more vitality to the pertinent Michigan statutes and support our ruling here. We therefore hold that pursuant to § 16 of PERA, MERC *may*, when presented with allegations of unfair labor practices, defer hearing of those charges until after an arbitration award has been rendered pursuant to the parties' binding collective bargaining agreement, *where* (1) a stable bargaining relationship and the absence of enmity is found to exist between the parties; (2) there is found to exist an intent on the respondent's part to exhaust the parties' contract grievance procedures culminating in final and binding arbitration; and (3) the subject matter of the alleged unfair labor practice is determined to be arguably covered by the parties' collective bargaining agreement, centering on the interpretation or application of the contract.

Affirmed as to the determination set forth above, but reversed and remanded as to the deferral of the Detroit Fire Fighters Association's charge that the city refused to furnish relevant information.

## I. FACTS

*A. Factual and Procedural Background: The Objected-to City Plan of Reorganization*

On March, 24, 1976, Fire Commissioner Jeffer-

son issued a press release indicating that the city intended to close one fire station, eliminate four tactical mobile squads as well as three engine and two ladder companies, demote an unspecified number of officers (ostensibly to increase the fire fighter/fire chief ratio), and transfer certain personnel in an apparent attempt to strengthen certain overburdened fire companies. This plan was to be implemented on March 29, 1976, without prior discussion, allegedly in furtherance of a city-wide April 4 projected layoff scheme.[7]

On March 25, 1976, one day after the issuance of Commissioner Jefferson's press release, the association filed a written protest with the city objecting to the press release proposals. The association maintained that the proposed plan violated both PERA and various provisions of the parties' collective bargaining agreement, demanded good faith bargaining, and insisted that the city refrain from implementing the reorganization pending such negotiations. The letter also requested certain information more precisely describing the reorganization's effects on personnel.

The following day, the Fire Commissioner issued a separate bulletin proposing the demotion of approximately 150 officers. Further, a meeting was held between city and association representatives

---

[7] While neither the parties' briefs nor the administrative hearing transcript are particularly clear in this regard, it appears that 241 uniformed city employees were to be laid off on April 4, 1976 due to the city's fiscal instability which had likewise depleted the Fire Department's budget. The city asserted at the hearing that the press release proposals were undertaken to fulfill the April 4, 1976 projected layoff plan, "and were to take effect on or about the 29th, so that the department would be organized fully to meet the layoff situation". Association counsel countered that the proposed March 29 layoffs were not made in contemplation of concurrently fulfilling the April 4 deadline but, rather, were "ostensibly pursuant to the city's claim of reorganization".

to consider the association's objections. Concurrent with this meeting, the association petitioned Judge O'Hair for a temporary restraining order relative to the city's intended reorganization. That petition was granted and an order issued.

Subsequent to Judge O'Hair's restraining order, on March 27 and 29, 1976, the Fire Commissioner issued two further bulletins which substantially sought to fulfill the terms of the March 24 reorganization press release.

On March 29, 1976, the city sought to implement the bulletins without the benefit of prior bargaining with association representatives. Insofar as such attempted implementation was determined by Judge O'Hair to be contrary to his March 26 temporary restraining order, the Fire Department's Commissioner, Deputy Commissioner, and Acting Chief were held in civil contempt. The city subsequently abandoned its disputed activities.

### B. The Current Unfair Labor Practice Charges and Proceedings

#### 1. Decision and Recommended Order of Administrative Law Judge Kurtz: Pre-Arbitral Deferral Granted

Concurrent with the association's petition for a temporary restraining order and its extra-judicial meeting with city representatives, on March 26, 1976, the association formally charged the city with statutory unfair labor practice violations before MERC. The association charged the city with having violated § 10(1), subds (a) and (e)[8] of PERA, in that:

---

[8] Section 10(1), subds (a) and (e) of PERA, MCL 423.210(1), subds (a) and (e); MSA 17.455(10)(1), subds (a) and (e), provide as follows:

"It shall be unlawful for a public employer or an officer or agent of a public employer (a) to interfere with, restrain or coerce public employees in the exercise of their rights guaranteed in section 9;

"On or about March 26, 1976, the above-named employer refused to bargain with the charging party by unilaterally altering working conditions, including manpower and safety, of employees represented by the charging party by ordering the discontinuance of four battalions and four tactical mobile squads, demoting at least 150 officers, and transferring affected personnel; and refusing to bargain with regard to same, to desist from same pending negotiations, and to furnish requested information with respect thereto."

On June 7, 1976, counsel for both parties appeared before MERC Administrative Law Judge (hereinafter ALJ) Kurtz, *Detroit Fire Dep't,* 1977 MERC Lab Op 267, 280. At the outset of that hearing, counsel for the city admitted all factual allegations, except the refusal to furnish information allegation, of the association's charge. The city then moved for pre-arbitral deferral of MERC's "jurisdiction in this matter to the contractual grievance procedure which includes binding arbitration" inasmuch as "a clearly contractual dispute" was at issue. After argument between counsel on the record, albeit without the benefit of testimony, ALJ Kurtz granted the city's motion to defer the matter to the contractual grievance-arbitration procedure contained in the parties' collective bargaining agreement.

At the hearing, counsel for the city characterized the disputed actions as personnel shifts, in-

---

* * * or (e) to refuse to bargain collectively with the representatives of its public employees, subject to the provisions of section 11."

Section 9 of PERA, MCL 423.209; MSA 17.455(9), in relevant part provides for the voluntary organization of public employees for the purposes of collective negotiation or bargaining. Section 11, MCL 423.211; MSA 17.455(11), in relevant part, details the status of public employee "exclusive representatives". Compare § 8(a), subds (1) and (5) of the National Labor Relations Act, 29 USC 158(a), subds (1) and (5) with § 10(1), subds (a) and (e) of PERA, which sections are virtually identical in language.

tended to be undertaken concurrently with the anticipated April 4, 1976, layoff of 251 Fire Department employees; these layoffs were explained as occasioned by a general city-wide fiscal crisis necessitating reductions in many city departments due to departmental budget reductions.

Specifically addressing the contractual nature of the charge, the city maintained that both the proposed demotions and transfers were personnel shifts authorized under Article 10 of the parties' contract dealing with seniority.[9] Similarly, the battalion and squad reductions were posited as arguably authorized by Article 12.E6[10] of the par-

---

[9] Article 10 of the parties' collective bargaining agreement provides in pertinent part:

"E. *Promotions and Transfers—Fire Fighting Division*

\* \* \*

"4. Transfer of Location:

"Employees in the Fire Fighting Division seeking location transfers will be offered a transfer to the location of their preference where a vacancy exists, in accordance with seniority, where practicable, and in such a manner as will not adversely affect the operation of the department.

\* \* \*

"K. Layoffs or demotions attributable to reduction in force, and recalls, shall be in accordance with Personnel Department Rules XI and XIV."

[10] Article 12.E6 of the parties' collective bargaining agreement provides in pertinent part:

"12. MISCELLANEOUS

\* \* \*

"E. The City of Detroit agrees:

\* \* \*

"6. There will be eleven Tactical Mobile Squads of four men each that will provide reserve manpower for each Battalion to achieve constant level staffing of engines and ladders and will provide a mobile team of Fire Fighters to respond to all structure fires or fires of some consequence."

While the city admitted that Article 12.E6 of the parties' contract provided for 11 tactical mobile squads, each engaging four reserve fighters, counsel for the city maintained that the squad reduction was necessitated by the impending layoffs. Counsel continued that while Article 12.E6 provides for 11 squads, at no time had more than 9

ties' contract and necessary products of the April 4 layoff scheme.

The city asserted that it had provided all requested information pertinent to the proposed actions outlined in the March 26 press release. No contract clause was offered as embracing information request disputes.

Responding to the city's motion for pre-arbitral deferral, the association did not contest counsel's admission that the city had indeed violated certain contractual mandates of the parties' collective bargaining agreement. The association nonetheless objected to deferral under the instant circumstances, alleging that, as a prevailing complement to these contractual transgressions, "such actions were plainly violative of the city's statutory obligations under PERA [§ 10(1), subds (a) and (e)] to refrain from unilateral changes and [sic] material conditions of employment, particularly insofar as the impact upon manpower and * * * the impact upon safety".[11] Citing earlier promotional-standard disputes,[12] the unilateral nature of the Fire Com-

squads existed and these had been frequently operated with only three persons. Similarly, at no time had the number of battalions been negotiated; in fact, their only reference can be found in Article 12.E6 which simply requires reserve personnel for each operating battalion. At no prior time had the association objected to either of these deficiencies.

[11] See fn 8, *supra,* for the pertinent language of PERA, § 10.

[12] In a matter factually unrelated to the present litigation, on November 18, 1975, labor arbitrator Casselman ordered the city to promote approximately 150 of the association's fire fighters to vacant positions. Shortly after the Casselman arbitration award, the association charged the city with an intent to promote roughly one-third of those fire fighters on the basis of racial, rather than seniority, considerations in violation of Article 10E of the parties' agreement and filed § 10 unfair labor practice charges, alleging that the city was engaging in unilateral changes in promotional standards. These charges were determined to be meritorious. *Detroit Fire Dep't,* 1976 MERC Lab Op 652, *enforced* (Mich App, Docket No. 77-1460, September 13, 1977).

On February 23, 1976, Judge John D. O'Hair of the Wayne County

missioner's press release, as well as the department's violations of Judge O'Hair's temporary restraining order, the association urged that pre-arbitral deferral was inappropriate in view of the city's disregard of the parties' collective grievance-bargaining mechanism. The association additionally asserted that the city's refusal to supply requested information precluded pre-arbitral deferral.

On August 9, 1976, ALJ Kurtz granted the city's pre-arbitral deferral motion, declining to entertain the matter any further and deferring the association's disputes to the parties' contractual grievance-dispute arbitration machinery "with the usual proviso that the Commission retain jurisdiction for the purpose of determining whether any eventual arbitration decision, and the handling of any grievance, is in accord with the PERA and Commission policy", *Detroit Fire Dep't,* 1977 MERC Lab Op 267, 280, 285. Pivotal to this decision were the ALJ's conclusions that

"the previous failures of the employer in its bargaining with the union do not evidence an 'anti-union history' which would sustain a finding that the city has a background of such hostility and animosity towards collective bargaining and contractual grievance settlement processes so as to justify a refusal to defer to arbitration. * * * Nor is reorganization plan in this case a clear refusal to obey a prior arbitration award, as was involved in the previous fire department case before ALJ Bixler * * *. The information requested by the union relates directly to the specifics of the contemplated changes, which data can be adequately supplied

Circuit Court issued a preliminary injunction ordering the city to comply with the Casselman arbitration award. Pursuant to Judge O'Hair's order, Fire Commissioner Jefferson issued two bulletins effectuating the award. Appeals by the city from this order were later dismissed by the Court of Appeals, *Detroit Fire Fighters v Detroit,* (Docket Nos. 27871, 28061, April 5, 1976).

with the aid of the arbitrator in an arbitration proceeding." *Id.,* 284. (Citations omitted.)

Ruling at the hearing on the city's motion for pre-arbitral deferral, ALJ Kurtz stated the following to counsel for the association:

."Well, it clearly appears to me that you have a contract situation here, Mr. Sachs, and that the arbitrator can resolve this—the alleged violations. This may also be, I agree, violations of our statute, but it seems to me under the deferral doctrine the arbitrator is given first look at it and I see no reason why he shouldn't in this case."

## 2. MERC and Court of Appeals Affirmance of ALJ Kurtz's Pre-Arbitral Deferral Order

On April 4, 1977, MERC Commissioners Rehmus and Milmet affirmed the decision and recommended order of ALJ Kurtz; Commissioner Ellmann dissented. *Detroit Fire Dep't,* 1977 MERC Lab Op 267.[13] The MERC majority: (1) rejected the association's allegations of sufficient anti-union history and animosity toward the collective bargaining process to preclude deferral; (2) determined that deferral in this instance was consistent with prior MERC decisions and policy; (3) eschewed the notion that the association's disputes primarily involved statutory obligations; and (4) concluded that insufficient evidence had been presented to establish a clear refusal by the city to comply with the association's information request and that this charge could be properly resolved in

---

[13] Commissioner Ellmann dissented, citing his general disagreement with the deferral doctrine and his specific objection to deferral where the provision of requested information is in dispute. *Id.,* 279-280.

the arbitral forum. *Id.,* 277-278.[14] MERC retained jurisdiction to review both the arbitral proceedings and award.

On September 13, 1977, the Court of Appeals affirmed by order the MERC decision to defer exercise of its jurisdiction to the arbitral process. CAVANAGH, J., dissented without separate opinion. Central to its ruling was the MERC finding that the dispute "here, [is] arguably subject to the contractual arbitration clause in the collective bargaining agreement between the parties". The Court of Appeals did not address the association's charge relative to the city's alleged refusal to furnish requested information.

## II. ISSUE AND ARGUMENTS OF THE PARTIES

On April 17, 1978, this Court granted the association's application for leave to appeal, limited to the following issue:

"Whether the Michigan Employment Relations Commission may, when presented with allegations of unfair labor practices, defer hearing of those charges until after an arbitration award has been made pursuant to the collective bargaining agreement, where the subject matter of the alleged unfair labor practices is arguably covered by the collective bargaining agreement in question."

Along with other arguments raised by the asso-

---

[14] With respect to its ruling on the allegedly withheld information, the MERC majority prospectively instructed its ALJs "to take evidence on the merits of a charge of refusal to supply requested data in order to determine whether deferral on the underlying charges, if any, is proper". *Id.,* 278. Consistent with this ruling and instruction, MERC specifically retained jurisdiction and announced that it would "permit charging party to request further proceedings in this matter should there be unnecessary delays or a refusal to furnish relevant data in the arbitration process". *Id.*

ciation which we do not address,[15] the association contends that this question should be answered in the negative inasmuch as: (1) pre-arbitral deferral violates MERC's statutory obligation to remedy unfair labor practice charges as provided in § 16 of PERA; (2) PERA, as interpreted in *Rockwell v Crestwood School Dist,* 393 Mich 616, 642-643; 227 NW2d 736 (1975), *app dis* 427 US 901; 96 S Ct 3184; 49 L Ed 2d 1195 (1976), prohibits MERC from refusing to decide statutory unfair labor practice charges properly within its jurisdiction; and (3) unlike the Federal congressional policy favoring arbitral resolution of grievance disputes, no such countervailing policy is expressed in the Michigan statutory scheme to support arbitral deferral.

The city responds to these arguments as follows: (1) § 16 of PERA grants MERC discretionary authority to defer disputes arguably within the parties' contractual, collective bargaining agreement; (2) *Rockwell v Crestwood School Dist,* is distin-

[15] The association has additionally argued that pre-arbitral deferral is impermissible for the reasons that: (1) deferral to arbitration violates MERC's duty to resolve unfair labor practice charges on the basis of substantial and competent evidence; (2) pre-arbitral deferral precludes effective judicial or administrative review of an arbitrator's award; and (3) sound labor as well as administrative policy reasons militate against the desirability of *Collyer* deferral. *Collyer Insulated Wire,* 192 NLRB 837; 77 LRRM 1931 (1971).

In considering the limited issue framed by this Court in our grant of leave to appeal, we have addressed only the validity of *pre-*arbitral deferral under § 16 of PERA (*i.e.,* whether MERC may, in its discretion, defer hearing on unfair labor practice charges arguably covered by the parties' binding collective bargaining agreement *until after an arbitration award has been made* pursuant to § 16 of PERA). We will therefore not entertain the association's arguments concerning the statutory and constitutional efficacy of *post-*arbitration award, or *Spielberg,* deferral. *Spielberg Mfg Co,* 112 NLRB 1080; 36 LRRM 1152 (1955). The association's supplemental arguments neither fall properly within the scope of the issue, nor do they arise from the facts or ambit of MERC's decision to defer the instant matter to the arbitral process. We will not anticipate potential issues and offer advisory opinions respecting issues not ripe for review.

guishable from the deferral question and its general mandate has nonetheless been fulfilled; and (3) like the Federal policy, the Michigan labor regulatory scheme favors the concept of pre-arbitral deferral insofar as that concept furthers the policy preference for the voluntary resolution of grievance disputes.

### III. DISCUSSION

The matter of pre-arbitral deferral under § 16 of PERA is one of first impression in this state. There are, however, abundant decisions of the NLRB, the United States Supreme Court and the United States Circuit Courts of Appeal considering comparable doctrine and provisions emanating from the NLRA, upon which the parties have relied in addressing the pre-arbitral deferral issue on leave. The Michigan labor relations acts are modeled on the NLRA, *Rockwell v Crestwood School Dist,* fn 2 *supra,* 635-636. PERA is derived from that act, *Lamphere Schools v Lamphere Federation of Teachers,* 400 Mich 104, 120; 252 NW2d 818 (1977). Section 16 of PERA is virtually identical in language to § 10, subds (b), (c), and (e) of the NLRA, from which the doctrine of pre-arbitral deferral arises. Therefore, this Court "may appropriately look to the Federal precedents for guidance" in considering the propriety of pre-arbitral deferral. *MERC v Reeths-Puffer School Dist,* 391 Mich 253, 260; 215 NW2d 672 (1974). See *Detroit Police Officers Ass'n v Detroit,* 391 Mich 44, 53; 214 NW2d 803 (1974). We will likewise review MERC's treatment of the deferral doctrine as it has been shaped by the Federal sphere.

### IV. THE NLRB'S AND THE FEDERAL JUDICIARY'S POSITION ON THE DISCRETIONARY EXERCISE OF DEFERRAL AUTHORITY UNDER THE NLRA

## A. NLRB Power to Prevent Unfair Labor Practice: Statutory and Policy Tensions

Section 7 of the NLRA, 29 USC 157, guarantees workers the right to organize and engage in collective bargaining without interference. Those specific practices proscribed as interfering with a worker's § 7 rights have been deemed "unfair labor practice[s]" and are codified in § 8 of the NLRA, 29 USC 158.

Through § 10 of the act, 29 USC 160, Congress has engineered a mechanism for NLRB review and enforcement of § 8 charges, and authorizes the NLRB

"(a) to prevent any person from engaging in any unfair labor practice (listed in § 8 of this title) affecting commerce. *This power shall not be affected by any other means of adjustment or prevention* that has been or may be *established by agreement,* law or otherwise * * *." (Emphasis supplied.)

In determining the propriety of discretionary NLRB deference to the litigants' contractually-forged binding arbitral process, both the Federal judiciary and the NLRB have been confronted with the apparent tension between two competing congressional policies: one policy discourages while the other supports the exercise of deferral authority.

The first policy favors NLRB remedial independence and casts the board as the sole arbiter of statutory unfair labor practices.[16] This congressional policy, reflecting the literal mandate of NLRA, § 10(a) quoted above, necessarily operates to the exclusion of arbitral deferral.

The second policy encourages affording "full play" to

[16] See *NLRB v Walt Disney Productions,* 146 F2d 44, 48 (CA 9, 1944), *cert den* 324 US 877; 65 S Ct 1025; 89 L Ed 1429 (1945); *NLRB v International Union, United Automobile, Aircraft & Agricultural Implement Workers of America, Local 291,* 194 F2d 698, 702 (CA 7, 1952).

the voluntary, contractual resolution of grievance disputes[17] and elevates the arbitral mechanism for grievance adjustment to a preferred position in Federal labor law.[18] This policy preference embraces the concept of discretionary deferral authority despite the literal mandate of NLRA, § 10(a)[19] and finds support in § 203(d) of

---

[17] See *Gateway Coal Co v United Mine Workers of America*, 414 US 368, 377-382; 94 S Ct 629; 38 L Ed 2d 583 (1974).

[18] See *Nabisco, Inc v NLRB*, 479 F2d 770, 773 (CA 2, 1973). The Supreme Court has injected the perspective that arbitration has served the national interest by effecting a "substitute for industrial strife", *United Steelworkers of America v Warrior & Gulf Navigation Co*, 363 US 574, 578-583; 80 S Ct 1347; 4 L Ed 2d 1409 (1960). The Steelworkers Trilogy teaches that arbitration offers an alternative to economic coercion. *United Steelworkers v Warrior & Gulf Navigation Co, supra; United Steelworkers of America v American Mfg Co*, 363 US 564; 80 S Ct 1343; 4 L Ed 2d 1403 (1960); *United Steelworkers of America v Enterprise Wheel & Car Corp*, 363 US 593; 80 S Ct 1358; 4 L Ed 2d 1424 (1960).

Section 1 of the NLRA provides in pertinent part that, "It is declared to be the [national] policy * * * to mitigate and eliminate these obstructions * * * by encouraging the practice and procedure of collective bargaining". 29 USC 151.

[19] As originally drafted, the principal author of the NLRA had proposed the inclusion of language in § 10 to the effect that the "board may, in its discretion, defer the exercise of jurisdiction over any such unfair labor practice in any case where there is another means of prevention provided for by the agreement * * *". S 1958, 74th Cong, 1st Sess, 79 Cong Rec 2369 (1935). This language, however, was deleted from the section's final enactment. In its place, § 10(b), as well as § 10(a), was enacted to provide that "[w]henever it is charged that any person has engaged in * * * any such unfair labor practice, the Board, * * * *shall have power* to issue and cause to be served * * * a complaint * * *". 29 USC 160(b).

It *is apparent from this juxtaposition of* § 10, subds (a) and (b), as proposed and as enacted, that while the NLRB has not been expressly granted discretionary deferral authority, neither has the board been expressly mandated to hear, resolve, or enforce *all statutory* unfair labor practices. Rather, the board has merely been provided the "power" to exercise authority over § 8 claims; the door has arguably been left somewhat ajar for the entrance of the deferral doctrine. See generally, Murphy & Sterlacci, *A Review of the National Labor Relation Board's Deferral Policy*, 42 Fordham L Rev 291 (1973); Zimmer, *Wired for Collyer: Rationalizing NLRB & Arbitration Jurisdiction*, 48 Ind L J 141 (1973); Teple, *Deferral to Arbitration: Implications of NLRB Policy*, 29 Arbitration J 65 (1974).

The legislative history of the Taft-Hartley amendments to the NLRA, commonly referred to as the Labor Management Relations Act, 29 USC 141-144, 29 USC 151-168, 29 USC 171-187, similarly indicated Congress's anticipation that the NLRB would "develop by

the Labor Management Relations Act (hereinafter LMRA), 29 USC 173(d), which provides that,

"Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective bargaining agreement."[20]

As will be revealed below, this conflict has largely been resolved in favor of discretionary deferral authority in both *post*-award, or *Spielberg Mfg Co,* 112 NLRB 1080; 36 LRRM 1152 (1955), and *pre*-arbitral, or *Collyer Insulated Wire,* 192 NLRB 837; 77 LRRM 1931 (1971), deferral situations. Rather than taking either of these two policy extremes, however, Federal authorities have embraced the *tertium quid* and upheld the arbitral deferral doctrine provided the NLRB retains statutory jurisdiction to review the ultimate arbitral

---

rules and regulations, a policy of entertaining * * * only such cases * * * as cannot be settled by resort to the machinery established by the contract itself, voluntary arbitration * * *." S Rep No 105, 80th Cong, 1st Sess 23.

[20] As stated by Simon-Rose in his article, *Deferral Under Collyer by the NLRB of Section 8(a)(3) Cases,* 27 Labor L J 201, 202 (1976), the deferral enigma has largely resulted from congressional failure "to explain what impact, if any, LMRA, § 203(d) would have on the Board's exclusive authority to administer the NLRA pursuant to § 10(a) of the Act". *Cf.* Sieger, *NLRB Deferral to Arbitration in Unfair Labor Practices,* 26 NYU Conference on Labor 19, 22-23 (1974) (power to defer is within the NLRB's ancillary jurisdiction).

Admitting that LMRA § 203(d) does not specifically apply to the NLRB, the board majority in *Collyer Insulated Wire,* 192 NLRB 837; 77 LRRM 1931 (1971), nonetheless cited that section as supporting its pre-arbitral deferral decision. The board stated:

" '[T]he Board has not been commissioned to effectuate the policies of the Labor Relations Act so single-mindedly that it may wholly ignore other and equally important Congressional objectives. Frequently the entire scope of Congressional purpose calls for careful accommodation of one statutory scheme to another, and it is not too much to demand of an administrative body that it undertake this accommodation without excessive emphasis upon its immediate task.' " *Id.,* 840, fn 7, quoting *Southern Steamship Co v NLRB,* 316 US 31, 47; 62 S Ct 886; 86 L Ed 1246 (1942).

award. No lesser authority than the United States Supreme Court has indicated in dictum its approval of the deferral doctrine when Mr. Justice Brennan remarked for a unanimous Court in *William E Arnold Co v Carpenters Dist Council of Jacksonville,* 417 US 12, 16-17; 94 S Ct 2069; 40 L Ed 2d 620 (1974), as follows:

"Indeed, Board policy is to refrain from exercising jurisdiction in respect of disputed conduct arguably both an unfair labor practice and a contract violation when, as in this case, the parties have voluntarily established by contract a binding settlement procedure. * * * The Board said in *Collyer,* 'an industrial relations dispute may involve conduct which, at least arguably, may contravene both the collective agreement and our statute. * * * We believe it to be consistent with the. fundamental objectives of Federal law to require the parties * * * to honor their contractual obligations rather than, by casting [their] dispute in statutory terms, to ignore their agreed-upon procedures.' * * * The Board's position harmonizes with Congress' articulated concern that, '[f]inal adjustment by a method agreed upon by the parties is * * * the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement * * *.' 29 USC 173(d)."[21]

## B. The Post-Arbitration Award Spielberg Deferral Doctrine

Federal response to the question of NLRB deferral first arose in a *post*-arbitral award deferral context. Inasmuch as the doctrine of discretionary

[21] See also *Carey v Westinghouse Electric Corp,* 375 US 261, 271; 84 S Ct 401; 11 L Ed 2d 320 (1964), citing *International Harvester Co,* 138 NLRB 923, 925-926; 51 LRRM 1155 (1962), *aff'd sub nom Ramsey v NLRB,* 327 F2d 784 (CA 7, 1964), *cert den* 377 US 1003 (1964) (approving post-arbitral award deferral); *Textile Workers Union of America v Lincoln Mills of Alabama,* 353 US 448, 452-456; 77 S Ct 912; 1 L Ed 2d 972 (1957).

*pre*-arbitral deferral, under consideration here, emanated from that decisional authority and rationale supporting *post*-award deferral, we will first briefly address the *post*-award, or *Spielberg,* deferral doctrine. As indicated in footnote 15, *supra,* our discussion of the NLRB's *Spielberg* doctrine is not intended to sanction that rule but is, rather, offered only to elucidate the concept of *Collyer* prearbitral deferral.

In *Spielberg Mfg Co,* 112 NLRB 1080; 36 LRRM 1152 (1955), the parties agreed to submit their employee reinstatement dispute to contractual binding arbitration. The arbitration panel concluded that reinstatement was not required under the terms of the parties' agreement. Upholding that award, the NLRB emphasized that it was not legally bound by the private tribunal's resolution pursuant to § 10(a) of the act, but concluded that it would not upset it where

> "* * * *the proceedings appear to have been fair and regular, all parties had agreed to be bound, and the decision of the arbitration panel is not clearly repugnant to the purposes and policies of the Act.* In these circumstances we believe that the desirable objective of encouraging the voluntary settlement of labor disputes will best be served by our recognition of the arbitrators' award." *Id.,* 1082. (Emphasis supplied.)

The *Spielberg* doctrine was elaborated upon and clearly reaffirmed in *International Harvester Co,* 138 NLRB 923, 925-926; 51 LRRM 1155, 1157 (1962). The Supreme Court added its imprimatur to the post-award deferral doctrine in *Carey v Westinghouse Electric Corp,* 375 US 261, 271; 84 S Ct 401; 11 L Ed 2d 320 (1964), quoting with approval the following statement from *International Harvester Co, supra,* 925-926:

" 'There is no question that the Board is not precluded from adjudicating unfair labor practice charges even though they might have been the subject of an arbitration proceeding and award. Section 10(a) of the Act expressly makes this plain, and the courts have uniformly so held. *However, it is equally well established that the Board has considerable discretion to respect an arbitration award and decline to exercise its authority over alleged unfair labor practices if to do so will serve the fundamental aims of the Act.*

" 'The Act, as has repeatedly been stated, is primarily designed to promote industrial peace and stability by encouraging the practice and procedure of collective bargaining. Experience has demonstrated that collective-bargaining agreements that provide for final and binding arbitration of grievance and disputes arising thereunder, "as a substitute for industrial strife," contribute significantly to the attainment of this statutory objective.' " (Emphasis supplied.)

In *Raytheon Co,* 140 NLRB 883, 884-886; 52 LRRM 1129 (1963), *rev'd on other grounds Raytheon Co v NLRB,* 326 F2d 471 (CA 1, 1964), the NLRB supplemented *Spielberg* by requiring that the unfair labor practice charge cognizable under the parties' agreement have been presented to, as well as considered by, the arbitral tribunal before post-award deferral would be deemed proper. *Spielberg* otherwise remained undisturbed.[22]

Although the *Spielberg* doctrine has been repeatedly addressed and refined by the Federal

---

[22] In *National Radio Co,* 198 NLRB 527, 530; 80 LRRM 1718 (1972), the board sought to extend the *Spielberg* doctrine to those instances where the contractual and statutory questions were not necessarily coextensive. *National Radio,* however, was flatly rejected and the decision expressly overruled in *General American Transportation Corp,* 228 NLRB 808, 809-810, fn 7; 94 LRRM 1483 (1977), where the board held that it would not exercise deferral where the statutory charge is not arguably within the ambit of the parties' agreement. See, generally, Casenote, *Labor Law—Deferral to Arbitration,* 1978 So Ill ULJ 98.

authorities,[23] it has survived both judicial and administrative scrutiny for the past approximately 30 years.[24] In short, our research discloses that the NLRB is empowered with discretion to abstain from entertaining an alleged unfair labor practice charge arguably covered by the parties' binding collective bargaining agreement and defer to the arbitral tribunal's award where the charge has been properly decided through private arbitration. The *Spielberg* doctrine has been fashioned as furthering the purposes of the Federal labor relations scheme despite the contradictory sense of NLRA, § 10(a).

## C. The Pre-Arbitral Collyer Deferral Doctrine

Between the benchmarks of *Spielberg* in 1955 and *Carey* in 1964, it is apparent that the Federal authorities had increasingly indicated a disposition to reconcile the competing claims of Federal labor policy in favor of the arbitral process. Especially was this clear in the case of *post*-award deferral. In the seminal decision of *Collyer Insulated Wire,* 192 NLRB 837; 77 LRRM 1931 (1971), however, the NLRB explicitly extended the ambit of discretionary NLRB deferral authority and ushered in the era of *"pre*-arbitral deferral",[25] representing

---

[23] See generally, Morris, The Developing Labor Law: 1971-1978 (BNA, 1978 Cum Supp), ch 18.

[24] Recent attempts to restrict the doctrine have been undertaken in *Banyard v NLRB,* 164 US App DC 235, 240; 505 F2d 342, 347 (1974) (the issue on which deferral is sought must have been clearly decided by the NLRB), and *Stephenson v NLRB,* 550 F2d 535 (CA 9, 1977). Neither of these judicial considerations have been adopted by the NLRB nor have they placed the post-award deferral concept in question. See generally, Recent Cases, *Labor Law—National Labor Relations Act—NLRB Deferral to Arbitration,* 88 Harv L Rev 804, 806 (1975); Recent Ninth Circuit Decisions, *Labor Law—NLRB Deferral to Arbitration Decisions,* 11 Loyola U of Los Angeles L Rev 199 (1977).

[25] The NLRB first summarily approved pre-arbitral deferral in *Consolidated Aircraft Corp,* 47 NLRB 694, 706; 12 LRRM 44, 45 (1943), aff'd *Consolidated Aircraft Corp v NLRB,* 141 F2d 785 (CA 9,

"an accommodation between, on the one hand, the statutory policy favoring the fullest use of collective bargaining and the arbitral process and, on the other, the statutory policy reflected by Congress' grant to the Board of exclusive jurisdiction to prevent unfair labor practices". *Id.,* 841.

In *Collyer,* the union charged that the employer had violated NLRA, § 8(a), subds (1) and (5) by allegedly undertaking unilateral changes in certain wages and working conditions. The employer maintained that it was so authorized pursuant to the parties' collective bargaining agreement as well as their prior course of contractual dealing. Accordingly, the employer averred that the dispute should be resolved through the parties' contractually binding grievance arbitration machinery as the appropriate forum for grievance adjustment despite the union's characterization of the dispute in statutory terms.

After reviewing the parties' factual allegations and contractual agreement, the NLRB majority opined that this was "essentially a dispute over the terms and meaning of the contract", *id.,* 837, which "in its entirety arises from the contract", *id.,* 839. The breadth of the arbitration provision satisfied the majority that "the parties intended to make the grievance and arbitration machinery the exclusive forum for resolving contract disputes". *Id.,* 839. Noting that "the dispute between these parties is the very stuff of labor contract arbitration", *id.,* 842, the board emphasized that "[t]he competence of a mutually selected arbitrator to decide the issue and fashion an appropriate remedy, if needed, can no longer be gainsaid". *Id.,* 842. Sensitive to the dissent's objection that deferral to

1944). That decision formed the basis for many of the insights offered in *Collyer,* especially the NLRB's preference for arbitral exhaustion.

private arbitral consideration would strip the parties of statutory rights and henceforward mandate private compulsory arbitration of otherwise statutory disputes, the NLRB majority responded:

"We are not compelling any party to agree to arbitrate disputes arising during a contract term, but are *merely giving full effect to their own voluntary agreements* to submit all such disputes to arbitration, *rather than permitting such agreements to be sidestepped and permitting the substitution of our processes, a forum not contemplated by their own agreement." Id.,* 842. (Emphasis supplied.)

The NLRB concluded that the threshold issue of whether to defer arises "only when a set of facts may present not only an alleged violation of the Act but also an alleged breach of the collective-bargaining agreement subject to arbitration". *Id.,* 841. Elaborating on those factors favoring pre-arbitral deferral,[26] the majority observed that "[t]he contract and its meaning * * * lie at the center of [the] dispute", such that,

"* * * the Act and its policies become involved only if it is determined that the agreement between the parties, examined in the light of its negotiating history and the practices of the parties thereunder, did not sanction Respondent's right to make the disputed changes * * * under the contractually prescribed procedure." *Id.,* 842.

"We conclude that the Board is vested with authority

---

[26] As support for its decision to defer the exercise of its authority to the arbitral process, the majority extensively quoted those pre-arbitral determinants established in *Jos Schlitz Brewing Co,* 175 NLRB 141; 70 LRRM 1472 (1969), and implicitly incorporated those in its *Collyer* equation. Beyond the requirements that the dispute be capable of resolution under the parties' agreement and that the respondent be willing, in good faith, to arbitrate, the NLRB additionally noted that the parties must exhibit a stable bargaining relation and the absence of anti-union animus. *Collyer, supra,* 841-842.

to withhold its processes in this case, and that the contract here made available a quick and fair means for the resolution of this dispute including, if appropriate, a fully effective remedy for any breach of contract which occurred." *Id.,* 839.

The NLRB announced that, per *Spielberg,* it would reserve jurisdiction pending arbitration to "guarantee that there will be no sacrifice of statutory rights if the parties' own processes fail to function in a manner consistent with the dictates of our law". *Id.,* 843. As justification for their announcement of the discretionary pre-arbitral doctrine subject to *Spielberg* review, the majority surveyed the Federal statutory labor scheme as well as the Federal sphere's interpretation thereof[27] and, in the words of concurring member Brown, found that "the *raison d'être* of the [NLRA] is to encourage collective bargaining". *Id.,* 844. The *Collyer* doctrine was cast as comporting with the "[dynamic] policy of this Nation to avoid industrial strife through voluntary resolution of industrial disputes". *Id.,* 843.

Since the *Collyer* decision, at least three Federal circuits have directly upheld that doctrine[28] and at least three others have offered implicit approval in considering whether the NLRB properly exercised

[27] See footnotes 16-20 and accompanying text, *supra.*

[28] The Second, Ninth and District of Columbia Circuits have directly upheld the *Collyer* doctrine although the Ninth Circuit has done so only in a per curiam opinion: *Nabisco, Inc v NLRB,* 479 F2d 770 (CA 2, 1973); *Local 2188, IBEW v NLRB [Western Electric],* 161 US App DC 168; 494 F2d 1087 (1974); *Associated Press v NLRB,* 160 US App DC 396; 492 F2d 662 (1974); *Provision House Workers Union, Local 274, AFL-CIO v NLRB,* 493 F2d 1249 (CA 9, 1974), cert den 419 US 828 (1974). See *NLRB v International Ass'n of Bridge, Structural, Ornamental & Reinforced Iron Workers Union, Local 378,* 473 F2d 816 (CA 9, 1973) (implicitly upholding the doctrine). The First Circuit upheld a board order deferring to arbitration where the petitioner attacked only the application of *Collyer* and not its validity. *Enterprise Publishing Co v NLRB,* 493 F2d 1024 (CA 1, 1974).

its authority *not* to defer.[29] While the NLRB's decisions in *Roy Robinson [Chevrolet], Inc,* 228 NLRB 828; 94 LRRM 1474 (1977), *General American Transportation Corp,* 228 NLRB 808; 94 LRRM 1483 (1977), and the Supreme Court's ruling in *Alexander v Gardner-Denver Co,* 415 US 36; 94 S Ct 1011; 39 L Ed 2d 147 (1974),[30] appear to have somewhat restricted the expansion of *Col-*

---

[29] The Seventh, Sixth and Fifth Circuits have implicitly upheld the *Collyer* doctrine: *NLRB v Thor Power Tool Co,* 351 F2d 584 (CA 7, 1965); *TIME-DC, Inc v NLRB,* 504 F2d 294 (CA 5, 1974); *NLRB v Cincinnati Local 271, Lithographers & Photoengravers International Union, AFL-CIO,* 495 F2d 763 (CA 6, 1974).

[30] In early 1977, the NLRB substantially contracted its policy of pre-arbitral deferral in its *General American Transportation Corp* and *Roy Robinson Chevrolet* decisions. Although these cases did not overrule *Collyer,* they did overrule much of its progeny to the extent that a 29 USC 158(a)(3) claim ("It shall be an unfair labor practice * * * (3) [to discriminate] in regard to hire or tenure of employment or any term or condition of employment * * *") is concerned.

In *General American Transportation Corp,* fn 22 *supra,* involving the discharge of an employee allegedly because of union activities, the NLRB held that the board would no longer defer in cases of alleged employer discrimination or interference with protected rights. The majority expressly overruled *National Radio Co,* 198 NLRB 527; 80 LRRM 1718 (1972), in which *Collyer* was extended to § 8(a)(3) discharges. See, generally, Casenote, fn 22 *supra,* 1978 So Ill ULJ 98.

In *Roy Robinson Chevrolet,* involving a plant shutdown in alleged violation of the employer's § 8(a)(5) bargaining obligation, the NLRB held that it would continue to defer under *Collyer* in cases involving § 8(a)(5) violations where the dispute is subject to, and resolvable by, contractual grievance arbitration procedures. This decision, at least implicitly, indicates that the board will likely defer to the arbitral process in § 8(a)(5) situations alone. See, generally, Novack, *Cutting Back on Collyer: The First Step in the Right Direction,* 28 Labor L J 785 (1977).

In *Gardner-Denver,* the Supreme Court held that an employee who alleged racially motivated discharge was entitled to pursue a claim under Title VII of the Civil Rights Act of 1964, 42 USC 2000e *et seq.,* even though that claim had already been rejected in a grievance proceeding. While *Gardner-Denver* dealt with Title VII rather than either the NLRA or the board's general pre-arbitral deferral authority, that case indicates that the NLRB may not defer in those instances where a Title VII claim arises under a non-discrimination clause of the parties' collective bargaining agreement. See, generally, Getman, *Can Collyer and Gardner-Denver Co-Exist? A Postscript,* 49 Ind L J 285 (1974); Novack, *Cutting Back on Collyer: The First Step in the Right Direction,* 28 Labor L J 785 (1977).

*lyer's* scope, the Federal sphere has consistently upheld and applied *Collyer's* four-factor test in determining whether pre-arbitral deferral is appropriate. The *Collyer* doctrine has been discussed favorably in *dicta* by the United States Supreme Court, *William E Arnold Co v. Carpenters Dist Council,* 417 US 12, 16-17; 94 S Ct 2069; 40 L Ed 2d 620 (1974), and has prompted the Second Circuit to state: "The validity of the *Collyer* doctrine is no longer seriously in doubt". *Lodges 700, 743, 1746, International Ass'n of Machinists v NLRB,* 525 F2d 237, 239 (CA 2, 1975).

### D. Summary of NLRB Deferral Policy

In summary, the NLRB has exercised discretionary deferral both prior to and following the decision of the parties' arbitral tribunal. *Spielberg* and its progeny generally indicate that the board will defer to a *prior arbitral award,* provided:

(1) the unfair labor practice dispute cognizable under the parties' collective bargaining agreement was presented to and considered by the arbitral tribunal;

(2) the arbitral proceedings were fair and regular;

(3) all parties to the arbitral proceedings agreed to be bound thereby; and

(4) the decision of the arbitral tribunal was not clearly repugnant to the purposes and the policies of the NLRA.

*Collyer* and its progeny generally indicate that the board will defer an alleged unfair labor practice charge to the parties' binding grievance-arbitration procedures memorialized in their collective bargaining agreement subject to *Spielberg* post-award review, provided:

(1) a stable collective bargaining relationship exists between the parties;

(2) the respondent is willing to resort to arbitration under a binding arbitration clause broad enough to embrace the dispute; and

(3) the contract and its meaning are at the center of the dispute.[31]

## V. MERC's POSITION ON THE DISCRETIONARY EXERCISE OF DEFERRAL AUTHORITY

### A. The Pre-Arbitral Deferral City of Flint Doctrine

In *City of Flint,* 1970 MERC Lab Op 367, a unanimous MERC predated the NLRB's *Collyer* decision by deferring resolution of an arguably contractual, training-schedule negotiation dispute to the parties' contractually established arbitral mechanism insofar as "[t]he record discloses that the issue dividing the [parties] is basically one of contract interpretation". *Id.,* 369. In adopting this pre-arbitral deferral posture whereby "[t]he contract procedure should be exhausted before the parties seek to have their contract disagreement settled by government", *id.,* 369, MERC approved the following general guidelines and policy rationale:

" 'If there is any situation in which the Board should defer to the parties' own agreed-upon methods for resolving contract disputes, this is the case. Thus, the parties have an *established* bargaining history; they have a *dispute involving substantive contract interpretation,* each party *asserting a reasonable claim in good faith * * *;* and they have *contractual grievance-arbitration procedures which Respondent has urged the Union to use for resolving their dispute.* In this context, the *[sic]* mindful of our competency in the area, we

---

[31] For a collection of cases considering both the NLRB's and the Federal judiciary's development of these doctrines, see generally, Morris, The Developing Labor Law: 1971-1978 (BNA, 1978 Cum Supp), ch 18.

believe that the policy of promoting industrial peace
and stability through collective bargaining impels us to
defer to the grievance-arbitration procedures the par-
ties themselves have voluntarily established.' " *Id.,* 370,
quoting *Unit Drop Forge Division, Eaton, Yale &
Towne, Inc,* 171 NLRB 600, 604; 68 LRRM 1129, 1133
(1968) (dissent). (Emphasis supplied.)

Concluding, MERC stated its acceptance of the
post-award deferral *Spielberg* doctrine and re-
marked:

"There will be situations in which we should, and will
take jurisdiction of the controversies which may in-
volved *[sic]* contract construction as well as an alleged
unfair labor practice. *But employers and unions should
make every effort to resolve issues primarily contrac-
tual under the contract dispute-settling procedure."*
1970 MERC Lab Op 371. (Emphasis supplied.)

In *University of Michigan,* 1971 MERC Lab Op
994, MERC considered deferring to arbitration a
charge of unilateral alteration of the lunch hour.
MERC approved the pre-arbitral deferral doctrine
and elaborated on the propriety of exercising such
authority, stating:

"We note that the collective bargaining agreement
contained an arbitration provision. The presence of this
arbitration clause does not divest this Commission of
jurisdiction from passing on the unfair labor practice.
However, left to this Commission is considerable discre-
tion as to whether we should decline to exercise our
unfair labor practice jurisdiction in the face of an
invoked grievance arbitration procedure. Under the
facts and circumstances in the present case, we hold
that the dispute between the parties is susceptible to
'the therapy of arbitration.' *Carey v Westinghouse Elec-
tric Corp,* 375 US 261, 272." 1971 MERC Lab Op 998.
(Citations omitted in part.)

The posture assumed by MERC in both the *City of Flint* and *University of Michigan* decisions was reaffirmed in *Wayne County Road Comm,* 1972 MERC Lab Op 1035, wherein the NLRB's *Collyer* decision was, for the first time, expressly cited with approval and extensively quoted. MERC opined that pre-arbitral deferral is appropriate where the "dispute arises under the contract", *id.,* 1040, since

"'disputes such as these can better be resolved by arbitrators with special skill and experience in deciding matters arising under established bargaining relationships than by the application * * * of a particular provision of our statute.'" *Id.,* 1041, quoting *Collyer, supra,* 839.

Pre-arbitral deferral was described as advancing the "declared * * * public policy of this state" evidenced in § 1 of the labor mediation act (LMA), MCL 423.1; MSA 17.454(1), "to promote the prevention or prompt settlement of labor disputes and other forms of industrial strife", *Wayne County,* 1041-1042. The Commission concluded:

"Under this policy, the Commission has the authority to decline to accept jurisdiction in a proceeding * * * and to defer to arbitration as a means which the parties themselves have agreed to for the prompt and efficient resolution of disputes arising over contract terms." *Id.,* 1042.

*B. Summary of MERC Pre-Arbitral Deferral Policy*
    Mirroring the *Collyer* doctrine, MERC has outlined its pre-arbitral deferral policy in the following succinct statement:

"Under *Collyer,* deferral of a charge presumes satis-

faction of *three requirements:* 1) *a stable bargaining relationship between the parties;* [32] 2) *intent on Respondent's part to exhaust* [33] *the contract grievance procedure culminating in final and binding arbitration;* [34] *and* 3) *the underlying dispute centers on the interpretation or application of the contract.* [35] The touchstone of deferral is that the dispute does not require a determi-

---

[32] See, *e.g., Detroit Fire Dep't,* 1977 MERC Lab Op 267, 276. *Cf. Lodges 700, 743, 1746, International Ass'n of Machinists & Aerospace Workers, AFL-CIO v NLRB,* 525 F2d 237, 245-246 (CA 2, 1975).

[33] See, *e.g., Detroit Fire Dep't,* 1977 MERC Lab Op 267, 276. *Cf. Cutten Supermarket,* 220 NLRB 507; 90 LRRM 1250 (1975).

[34] *City of Berkley Police Dep't,* 1973 MERC Lab Op 139, 146. *Cf. Champlin Petroleum Co,* 201 NLRB 83; 82 LRRM 1388 (1973).

[35] In considering whether to defer a charge to the parties' contractually established arbitral mechanisms, MERC has consistently required that the "subject matter of the charge [be] arguably covered by the contract clauses and is not primarily statutory in nature". *City of Warren Police Dep't,* 1978 MERC Lab Op 883, 884.

"The Commission will not police contracts by attempting to resolve disputes by interpretation of the contract and deciding whether disputes as to the meaning and administration of the contract constitute an unfair labor practice." *Detroit Fire Dep't, supra,* 273.

In *Riverview Community School Dist,* 1974 MERC Lab Op 59, 60-62, this requirement was elaborated on:

"Under the deferral doctrine, the Commission will withhold its jurisdiction if the dispute involves a contract issue combined with a violation of PERA. *A condition precedent to conditional dismissal is an issue that may be determined through the contract grievance and arbitration procedure. It must be a dispute which directly involves the application, enforcement or interpretation of the contract.* A statutory issue may also be an issue, but unless there is a contract issue, *Wayne County Road Comm* [1972 MERC Lab Op 1035] is not apposite.

\* \* \*

"While an arbitrator who is willing to resolve a statutory issue may reach the correct result, the Charging Party has appealed to the Commission for resolution of the subcontracting controversy. *As the issue is primarily a statutory question, i.e., whether the Respondent is required to bargain, the deferral doctrine is not relevant here.*" (Footnotes omitted, emphasis supplied.)

See, *e.g., Detroit Fire Dep't,* 1977 MERC Lab Op 267, 275-276 and cases cited therein (pre-arbitral deferral will be denied where "the issue concerns the scope of the statutory duty to bargain and does not turn upon the interpretation of an existing contract").

Even though a dispute may be arguably contractual in nature, however, MERC has ruled that deferral will be determined inappropriate where "interpretation of the contract becomes subordinate to the resolution of statutory questions". *Id.,* 271-275 and cases cited

nation or clarification of statutory obligations and is susceptible of resolution under the provisions and language of the contract. Pre-award deferral thus involves a preliminary review of the history and quality of the bargaining relationship, the amenability of Respondent to arbitrate,[36] the absence of anti-union animus, and the scope of the arbitration clause." *Detroit Fire Dep't,* 1977 MERC Lab Op 267, 276. (Emphasis supplied.)

Beyond MERC's clear reliance on the Federal sphere's development of the pre-arbitral deferral doctrine, the commission has justified its acceptance of that doctrine tempered by *Spielberg* post-award deferral notions:

"The question of whether an employer violated his duty to bargain in making unilateral changes in a collective bargaining agreement depends, quite obviously, on what the agreement provides, and this in turn may involve questions of interpretation and application. A solution which leaves all of these questions to MERC seems highly undesirable, since in many situations it would subject the parties to unnecessary costs and delay. In contrast, a solution which makes a private adjudicator the final and binding interpreter of the external law is improper and unattainable, even if it were desirable. *The third alternative, which would say that questions under the agreement are to be resolved by arbitrators, but that the results of arbitration, insofar as they involve the interpretation and application of the agreement itself, are to be taken as binding in subsequent litigation under the external law if they were satisfactorily considered there* [per *Spielberg*]*, is conceptually proper and meets the best interests of the parties in the vast majority of disputes." Id.,* 274. (Emphasis supplied.)

---

therein (representation questions; discipline for grievance activities; freedom of employees to engage in protected, concerted activity).

[36] See, *e.g., Detroit Fire Dep't,* 1977 MERC Lab Op 267, 275 and cases cited therein. *Cf. Pilot Freight Carriers, Inc,* 224 NLRB 341; 92 LRRM 1338 (1976).

## VI. HAS MERC PROPERLY FOUND DISCRETIONARY DEFERRAL AUTHORITY IN PERA, § 16?

The foregoing analysis demonstrates the significant comparability in doctrinal development of the NLRB's and MERC's pre-arbitral deferral postures. While it is patent that MERC's *City of Flint* doctrine has closely paralleled the federally-sanctioned *Collyer* doctrine in *substantive* respects, the question remains whether MERC, like the NLRB pursuant to NLRA, § 10, may exercise discretionary deferral authority pursuant to the *procedural* outline of PERA, § 16 subject to proper post-award review. We resolve this inquiry in the affirmative. Indeed, we find the propriety of PERA, § 16 discretionary deferral authority to be more ineluctable than the federally approved exercise of NLRA, § 10 deferral authority to which we look for guidance.

### A. The Virtual Identity in Language of PERA, § 16 and NLRA, § 10

Using language much like that of NLRA, § 8, through PERA, § 10, the Michigan Legislature has enumerated and declared "unlawful" certain actions deemed in PERA, § 16 to be "unfair labor practices *remediable* by [MERC]" (emphasis supplied). PERA, § 16 is the nearly precise statutory analogue of NLRA, § 10. Our discussion earlier in this opinion has established that the NLRB has been judicially accorded discretionary deferral authority over NLRA, § 8 claims pursuant to the statutory framework of NLRA, § 10. With marked similarity to the language of NLRA, § 10, § 16 of PERA provides a procedural framework for MERC review and enforcement of unfair labor charges:

"Violations of * * * [§ 10] shall be * * * *remediable* by the commission in the following manner:

"(a) Whenever * * * [a § 10 unfair labor practice] is charged * * * the commission * * * *may issue and cause to be served upon the person a complaint* stating the charges in that respect, and containing a notice of hearing * * *. Any complaint *may* be amended by the commissioner * * *. In the discretion of the commissioner * * * any other person *may* be allowed to intervene * * *.

"(b) The testimony taken by the * * * commission shall be reduced to writing and filed with the commission. Thereafter the commission upon notice *may* take further testimony or hear argument. *If upon the preponderance of the testimony taken the commission is of the opinion that any person named in the complaint has engaged in or is engaging in the unfair labor practice, then it shall state its findings of fact and shall issue and cause to be served on the person an order requiring him to cease and desist from the unfair labor practice, * * *. If upon the preponderance of the testimony taken the commission is not of the opinion that the person named in the complaint has engaged in or is engaging in the unfair labor practice, then the commission shall state its findings of fact and shall issue an order dismissing the complaint. * * **

\* \* \*

"(d) The commission or any prevailing party *may* petition the court of appeals for the enforcement of the order * * *." (Emphasis supplied.)

PERA, § 16 is the nearly precise statutory analogue of NLRA, § 10, which provides in pertinent part as follows:

"(b) Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board * * * shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing * * *. Any such complaint may be amended by * * * the Board in its discretion * * *. In the discretion

of the * * * Board, any other person may be allowed to intervene * * *.

"(c) The testimony taken by * * * the Board shall be reduced to writing and filed with the Board. Thereafter, in its discretion, the Board upon notice may take further testimony or hear argument. If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, * * *. If upon the preponderance of the testimony taken the Board shall not be of the opinion that the person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue an order dismissing the said complaint. * * *

                    *  *  *

"e) The Board shall have power to petition any court of appeals * * * for the enforcement of such order * * *."

We reiterate that PERA was patterned after and derives from the NLRA. One salient aspect of the statutory parallelism between PERA and the NLRA was recognized in *Detroit Police Officers Ass'n,* fn 6 *supra,* 53, where we found that § 15 of PERA "undoubtedly was patterned after § 8(d) of the * * * (NLRA) [inasmuch as] [b]oth statutes use almost identical language". The significance of this virtual identity in language was emphasized:

"The decision by the Michigan Legislature to adopt the language of § 8(d) of the NLRA is significant. Section 8(d) has been a part of the NLRA since the Taft-Hartley amendments of 1947. The terms of § 8(d) have been litigated in numerous cases before the National Labor Relations Board (NLRB) and the Federal courts. Although we cannot state with certainty, it is probably

safe to assume that the Michigan Legislature intentionally adopted § 15 PERA in the form that it did with the expectation that MERC and the Michigan courts would rely on the legal precedents developed under NLRA, § 8(d) to the extent that they apply to public sector bargaining." (Footnote omitted.) *Id.,* 53.

Given the virtual identity in language of PERA, § 16 and NLRA, § 10, we likewise find it "safe to assume" that § 16 was intentionally adopted in anticipation of this Court's as well as MERC's reliance on Federal precedent in construing the discretionary nature of MERC's § 16 deferral authority.

Inasmuch as our research of Federal precedential guidance discloses that deferral authority has been deemed proper under § 10 of the NLRA, we likewise find that MERC may exercise discretionary pre-arbitral deferral authority (subject to proper post-award review) under the virtually identical language of PERA, § 16:

"While Federal-state conflicts are concededly not at issue in this state case, precedents under the * * * (NLRA), from which the PERA is derived, are to be persuasively considered." *Lamphere Schools,* fn 3 *supra,* 120.

See *Rockwell,* fn 2 *supra,* 635-636; *Detroit Police Officers Ass'n,* fn 6 *supra,* 53; *Reeths-Puffer School Dist,* fn 6 *supra,* 260.

While it is clear that the procedural outline of PERA, § 16, much like NLRA, § 10, neither expressly authorizes nor prohibits discretionary deferral, it is equally clear that MERC's powers in this regard are framed in discretionary rather than mandatory terms. Substantially imitating the congressional statement, the Michigan Legislature penned this section to provide that: unfair labor

practices are "remediable" by the commission, not "shall be remedied"; MERC "may" issue a complaint, rather than "mandatorily shall" issue a complaint; finally, even if a violation is discerned, MERC "may", not "shall", petition the Court of Appeals for enforcement.

Our reading of PERA, § 16, much like the Federal sphere's treatment of NLRA, § 10, indicates that MERC "shall" have the authority to remedy primarily "statutory" unfair labor practices. MERC is not, however, mandatorily "required" to exercise that authority and "may", in its discretion, defer the exercise of its jurisdiction to arbitration in those instances where the commission is "of the opinion" that, among other factors discussed in Part V, B, *supra,* the respondent is not engaged in a primarily statutory unfair labor practice but, rather, is engaged in a practice arguably covered by the parties' collective bargaining agreement.

*B. Unfair Labor Practice Charges Are "Remediable" by MERC*

Again looking to the guidance of Federal precedent, we find further support for our acceptance of PERA, § 16 discretionary deferral authority in comparing the language and Federal treatment of NLRA, § 10(a) with the introductory paragraph of PERA, § 16.

Section 10(a) of the NLRA empowers the NLRB to prevent statutory unfair labor practices and further provides:

"This power *shall not be affected* by any other means of adjustment or prevention that has been * * * established by agreement * * *." (Emphasis supplied.)

Despite this seemingly mandatory language, the

Federal sphere has consistently held NLRB deferral to constitute a permissible exercise of NLRA, § 10 discretionary remedial authority. Significantly, such deferral authority has been federally sanctioned even though, as indicated in footnote 19, *supra,* express language authorizing deferral was deleted from NLRA, § 10 as finally enacted.

Unlike § 10(a) of the Federal statutory framework, § 16 of PERA is introduced by the following discretionary language:

"Violations of the provisions of section 10 shall be deemed unfair labor practices *remediable* by the commission * * *." (Emphasis supplied.)

Juxtaposed with the directory language of NLRA, § 10(a), it is inescapable that the Michigan Legislature sought to couch § 16 in discretionary terms and thereby avoid the obstacle to deferral originally posed by NLRA, § 10(a). The internal, statutory tension which the Federal sphere had to resolve in sanctioning deferral authority is significantly absent from our consideration here and compels our approval of PERA, § 16 discretionary deferral authority.

*C. PERA, § 16 Pre-Arbitral Deferral Authority Accords With This State's Policy Favoring the Voluntary Resolution of Disputed Labor Practices*

Much like the Federal sphere's determination that pre-arbitral deferral is merely an exercise in abstention rather than abdication, thereby furthering the Federal preference for arbitral resolution of labor disputes, we similarly find that MERC's deferral policy comports with this state's preference for the voluntary resolution of contractual labor disputes through mutually binding collective bargaining agreement procedures.

The Legislature has manifested this preference in the private sector through its enactment of the labor mediation act (LMA), "[a]n act * * * to provide for the mediation and arbitration of labor disputes", which has as its declared policy, "that the voluntary mediation of such disputes under the guidance and supervision of a governmental agency will tend to promote permanent industrial peace * * *", MCL 423.1; MSA 17.454(1). Section 10(1) of that act specifically maintains that the commission "shall take such steps as it may deem expedient to effect a voluntary, amicable, and expeditious adjustment and settlement [of the parties' labor dispute]". MCL 423.10(1); MSA 17.454(11)(1).

Through its enactment of PERA, the Legislature has likewise placed a premium on the voluntary resolution of public-sector labor disputes. Justice Moody's legislative history of PERA chronicled in his *Lamphere Schools* opinion, fn 3 *supra,* 116, buttresses this policy preference:

"The PERA drastically altered public employee labor relations in Michigan by amending the Hutchinson Act, 1947 PA 336. The Hutchinson Act had prohibited public employees from engaging in·collective bargaining. The PERA not only permitted collective bargaining by employees, see § 9, but it required public employers to negotiate with public employees' bargaining units, see § 10."

Indeed, in PERA, § 13, the Legislature commanded MERC "to insure public employees the full benefit of their right * * * to collective bargaining" with specific reference to fire fighting personnel. MCL 423.213; MSA 17.455(13).

Specific concern for arbitral resolution of fire fighter labor disputes was manifestly signaled

when the Legislature enacted the compulsory arbitration of labor disputes in police and fire departments act, MCL 423.231 *et seq.;* MSA 17.455(31) *et seq.,* which has as its stated policy:

"It is the public policy of this state that in * * * fire departments, where the right of employees to strike is by law prohibited, *it is requisite* to the high morale of such employees and the efficient operation of such departments *to afford an alternate, expeditious, effective and binding procedure for the resolution of disputes, and to that end the provisions of this act, providing for compulsory arbitration, shall be liberally construed."* (Emphasis supplied.) MCL 423.231; MSA 17.455(31).

We garner from the literal language of this state's labor regulatory scheme a legislative preference for the voluntary resolution of labor disputes. We find this preference especially compelling in the case of public employees and fire fighters who are denied the right to strike and statutorily limited to other avenues of dispute resolution including collective bargaining.

The Legislature's preference for the voluntary resolution of disputes through the parties' collective bargaining process was specifically discerned and sanctioned by this Court in *Kaleva-Norman-Dickson School Dist No 6 v Kaleva-Norman-Dickson School Teachers' Ass'n,* 393 Mich 583, 591; 227 NW2d 500 (1975), where we stated:

"*The policy favoring arbitration of disputes arising under collective bargaining agreements,* as enunciated by the United States Supreme Court in the Steelworkers' Trilogy, *is appropriate for contracts entered into under the PERA."* (Footnote omitted, emphasis supplied.)

VII. MERC's DISCRETIONARY EXERCISE OF PRE-
ARBITRAL DEFERRAL DOES NOT VIOLATE THE RULE
IN *ROCKWELL V CRESTWOOD SCHOOL DIST*

Association counsel implicitly argues that even
if MERC's authority under § 16 of PERA is deter-
mined to be discretionary and therefore amenable
to pre-arbitral deferral, such discretionary refusal
to remedy an alleged unfair labor practice violates
the rule in *Rockwell v Crestwood School Dist,* 393
Mich 616; 227 NW2d 736 (1975), *app dis* 427 US
901; 96 S Ct 3184; 49 L Ed 2d 1195 (1976). The
association cites *Rockwell* for the proposition that
"MERC may not refuse to exercise even its discre-
tionary powers without regard to the merits of a
given case".

In *Rockwell,* this Court was confronted with a
claim that MERC had consistently refused to pe-
tition the circuit court for temporary relief or a
restraining order pursuant to PERA, § 16(h) which
provides that MERC *"shall have power * * * to
petition any circuit court * * * for appropriate
temporary relief or restraining order"* (emphasis
supplied). We held such refusal impermissible,
stating:

"When the union filed with MERC the amended
unfair labor practice charge against the school board on
January 6, 1975, it requested the Commission to seek
immediate relief in the circuit court pursuant to § 16(h).
The director of the MERC responded the same day: 'It
has been the consistent policy of this Commission to
refrain from petitioning for temporary relief or a re-
straining order under the provisions of Section 16(h) of
the act. Therefore, your request is denied and the
charges filed in the matter will be processed in accor-
dance with established statutory procedures.'

*"Whatever the reasons for this policy—financial or
personnel limitations or other—the Commission may*

*not properly adopt an arbitrary policy of refusing to consider exercising, without regard to the circumstances, power conferred upon it by the PERA."* Id., 642.

"We simply hold that an administrative agency empowered to exercise discretion abuses its discretion and errs as a matter of law when it absolutely refuses in every and any instance to exercise its discretion." *Id.,* 643, fn 35.

We find that MERC's exercise of discretionary authority to defer an arguably contractual dispute properly within the parties' contractual collective bargaining mechanisms does not violate the holding of *Rockwell.* Our discussion in Part VI, *supra,* indicates that MERC has adopted and elaborated on federally-approved guidelines in its deferral determinations. MERC certainly has not evidenced an "arbitrary policy of refusing to consider exercising, *without regard to the circumstances,* power conferred upon it by the PERA" present in *Rockwell, supra,* 642. Nor has MERC erred as a matter of law by "refus[ing] in every and any instance to exercise its discretion" as found in MERC's behavior with regard to § 16(h) in *Rockwell, supra,* 643, fn 35.

In this instance, MERC has not only inquired into the *Collyer/City of Flint* merits of the contractual nature of the association's grievance, the bargaining history of the parties, and the city's willingness to arbitrate, but MERC has additionally retained jurisdiction to determine whether the arbitrator's ultimate award comports with the type of requirements enunciated by the NLRB in *Spielberg* and it progeny and adopted by MERC in *City of Flint,* 1970 MERC Lab Op 367, 369-370. (We reiterate that we express no opinion regarding the propriety of *Spielberg*-type post-award defer-

ral.) In view of these guidelines and MERC's in-
quiry in this instance, we can find no violation of
the principle established in *Rockwell.* MERC has
not abdicated its § 16 discretionary authority but
has merely abstained from deciding a dispute not
primarily statutory in nature and arguably cov-
ered by the parties' collective bargaining agree-
ment, until the parties have exhausted their con-
tractual remedies.

## VIII. PRE-ARBITRAL DEFERRAL AND THE PENDING UNFAIR LABOR PRACTICE CHARGES

Having determined that pre-arbitral deferral is
a permissible method for the resolution of argu-
ably contractual grievances in this jurisdiction, we
must now determine whether pre-arbitral deferral
is warranted in this instance. Under the guidelines
of the NLRB's *Collyer* doctrine as well as MERC's
decision in the present matter, pre-arbitral defer-
ral is appropriate when three conditions are ful-
filled: (1) a stable bargaining relationship and the
absence of enmity is found to exist between the
parties; (2) there is found to exist an intent on the
respondent's part to exhaust the parties' contrac-
tual grievance procedure culminating in final and
binding arbitration; and (3) the subject matter of
the alleged unfair labor practice is determined to
be arguably covered by the parties' collective bar-
gaining agreement, centering on the interpretation
or application of the contract. See *City of Flint,*
*supra.*

### A. Prior Stable Bargaining Relationship

Insofar as the first factor is concerned, the asso-
ciation claims that there exists sufficient anti-un-
ion animosity toward the collective bargaining

process and the parties' contractual grievance resolution procedure to render pre-arbitral deferral inappropriate. In support of this contention, the association cites three previous proceedings before MERC in which both the association and the city had been involved.[37] The city did not respond to this allegation.

After considering the contentions of both parties, the ALJ concluded that "the previous failures of the employer in its bargaining with the union do not evidence an 'anti-union history' which would sustain a finding that the city has a background of such hostility and animosity towards collective bargaining and contractual grievance settlement processes so as to justify a refusal to defer to arbitration. See *Machinists v NLRB*, 525 F2d 237 (CA 2, 1975), *aff'g United Aircraft Corp* [204 NLRB 879; 83 LRRM 1411 (1973)]." *Detroit Fire Dep't*, 1977 MERC Lab Op 267, 284. MERC affirmed this specific ruling, noting that "[a] litigious history between the parties does not necessarily render deferral inappropriate". *Detroit Fire Dep't*, 1977 MERC Lab Op 267, 277. The association has not supplemented its arguments in this regard on appeal.

Having reviewed the record as a whole, we find that MERC's factual determination in this regard is supported by competent, material and substantial evidence as required by MCL 423.23(e); MSA 17.454(25)(e). We likewise rule that MERC has not

---

[37] *Detroit Board of Fire Comm'rs*, 1968 MERC Lab Op 492, *enforced Detroit Board of Fire Comm'rs v Detroit Fire Fighters Ass'n*, 22 Mich App 137; 177 NW2d 216 (1970) (decision upholding MERC cease and desist order directed to the city's unilateral changes in promotional standards); *Detroit Board of Fire Comm'rs*, 1970 MERC Lab Op 953 (MERC order reversing ALJ's finding of unilateral alteration of promotional standards); and *Detroit Fire Dep't*, 1976 MERC Lab Op 652 (MERC order enforcing ALJ's finding of unilateral changes in promotional standards).

erred as a matter of law in making this finding,
Const 1963, art 6, § 28.

## B. Willingness to Arbitrate

This factor is fulfilled given the city's manifest
willingness to arbitrate the association's dispute
under the terms of the parties' binding collective
bargaining agreement.

## C. Arguably Contractual Nature of the Alleged Unfair Labor Practices Charge Centering on the Interpretation or Application of the Contract

In its charge before MERC, the association spe-
cifically alleged that:

"On or about March 26, 1976, the above-named em-
ployer refused to bargain with the charging party by
unilaterally altering working conditions, including man-
power and safety, of employees represented by the
charging party by ordering the discontinuance of four
battalions and four tactical mobile squads, demoting at
least 150 officers, and transferring affected personnel;
and refusing to bargain with regard to same, to desist
from same pending negotiations, and to furnish re-
quested information with respect thereto."

The issues of demotion and transfer are argu-
ably covered by Articles 10.E4 and 10.K of the
parties' collective bargaining agreement (set out in
fn 9, *supra*). The issues of tactical mobile squad
and battalion reductions are arguably covered by
Article 12.E6 of the parties' collective bargaining
agreement (set out in fn 10, *supra*).[38] The scope of
the parties' Article 7 arbitration clause is broad
enough to embrace arbitral consideration of these

---

[38] While Article 12.E6 is somewhat ambiguous in relation to the
unfair labor practices alleged by the association, we note that the
association generally accepted the contractual underpinnings of these
practices.

arguably contractual issues.[39] Inasmuch as the "arguably contractual" element of pre-arbitral deferral has been fulfilled in these particulars, we conclude, as did MERC, that these matters are appropriate for pre-arbitral deferral.

We do not agree, however, that MERC should have deferred the association's claim of refusal to furnish relevant information to the arbitral process. In its opinion, MERC recognized that "[g]enerally, where the contract is silent on the parties' duty to supply information demanded during the course of grievance proceedings, the NLRB has refused to defer * * *". MERC nonetheless granted deferral concluding that "in the instant matter there is insufficient evidence in the record to establish a clear refusal on respondent's part to comply with charging party's request for data". *Detroit Fire Dep't,* 1977 MERC Lab Op 267, 277-278. The commission concluded that "this portion of the charge can be properly disposed of in the arbitral forum". *Id.,* 278.

We have reviewed the record of this proceeding as well as the parties' collective bargaining agreement and can find no contractual basis for the provision of relevant information. In *American Standard, Inc,* 203 NLRB 1132; 83 LRRM 1245 (1973), the NLRB specifically ruled that deferral is inappropriate where the parties' contract is silent on the duty to provide such information. Therefore, consistent with our opinion that pre-arbitral deferral is appropriate only where the alleged charge is arguably covered by the parties' agree-

---

[39] Article 7 of the parties' collective bargaining agreement sets out a detailed grievance-arbitration procedure and provides: "B. The Arbitrator shall limit his decision to the interpretation, application, or enforcement of this Agreement or to matters fairly inferable therefrom, and he shall be without power or authority to make any decision" with respect to ten enumerated subjects not relevant to the case at bar nor contested by the parties.

ment, we reverse the MERC ruling in this respect and remand for a hearing pursuant to § 16 of PERA.

## IX. CONCLUSION

We hold that MERC may, when presented with allegations of unfair labor practices, defer hearing of those charges until after an arbitration award has been rendered pursuant to the parties' binding collective bargaining agreement, where the subject matter of the alleged unfair labor practices is arguably covered by the parties' collective bargaining agreement. In particular, we rule that under the guidelines of the NLRB's *Collyer* doctrine adopted by MERC in its *City of Flint* decision, pre-arbitral deferral is appropriate when three conditions are fulfilled: (1) a stable bargaining relationship and the absence of enmity is found to exist between the parties; (2) there is found to exist an intent on the respondent's part to exhaust the parties' contractual grievance procedure culminating in final and binding arbitration; and (3) the subject matter of the alleged unfair labor practice is determined to be arguably covered by the parties' collective bargaining agreement, centering on the interpretation or application of the contract. As provided by the MERC order in this matter, the parties may request post-award review of the arbitrator's determinations.

This Court is persuaded that pre-arbitral deferral is a permissible exercise of discretionary authority pursuant to § 16 of PERA and is not violative of the rule announced in *Rockwell v Crestwood School Dist.* We are likewise persuaded of the correctness of this holding in view of the sanction of this abstention doctrine, by the Federal sphere, to which we look for guidance, as well as

ETROIT FIRE FIGHTERS V DETROIT 731
OPINION BY LEVIN, J.

this state's policy preference for the voluntary resolution of grievance disputes.

Having upheld the general pre-arbitral deferral doctrine in this jurisdiction, we affirm MERC's deferral determination in this case, except to the extent that that determination ordered deferral of the association's charge of refusal to furnish relevant information. In this latter respect, we reverse and remand this charge to MERC for further consideration consistent with this opinion.

Affirmed in part, reversed and remanded in part. No costs, a public question being involved.

LEVIN, J. We agree with Justice WILLIAMS, for essentially the reasons stated by him, that pre-arbitral deferral is statutorily permissible.

Our limited grant of leave to appeal did not include the questions whether the MERC decision to defer in this case was appropriate and what standard of judicial review is applicable, and the briefs of the parties did not address those questions; hence we do not reach the merits of MERC's deferral decision in this case.

Since the deferral question is not presented in a factual context, and there is only presented the abstract question whether in some circumstances the MERC may defer, we should not attempt to announce the circumstances in which deferral is appropriate and express no opinion in that regard.

KAVANAGH, J., concurred with LEVIN, J.